Docket No. 104603.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

_In re_ SOPHIA G.L., a Minor (Andrew Cochran _et al._, Appellants, v. John Lindeman _et al._, Appellees).

_Opinion filed May 22, 2008._

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

This case involves a custody dispute between the parents and grandparents of a minor, Sophia G.L. It also involves a dispute over jurisdiction of the custody matter between two states, Illinois and Indiana. The question before this court is whether, under the provisions of the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 through 403 (West 2004)), Illinois should register the Indiana child-custody determination awarding Sophia's grandparents temporary custody. The circuit court of Greene County denied the petition to register. The appellate court reversed and remanded. 371 Ill. App. 3d 833. For the reasons that follow, we reverse the judgment of the appellate court.

## BACKGROUND

Sophia G.L. was born in Indiana on September 14, 2005, to then 22-year-old Alexis Lindeman. Alexis was unmarried. When Sophia was 10 days old, she and Alexis moved into the Indiana home of the appellees, Alexis' father, John Lindeman, and stepmother, Yvonne Lindeman. Alexis and Sophia remained in the Lindemans' home for six months. On March 30, 2006, Alexis and Sophia moved to Illinois to live with Andrew Cochran, Sophia's father. Shortly thereafter, on April 4, 2006, the Lindemans filed a verified emergency petition for custody of Sophia in the Circuit Court of Hendricks County, Indiana. In that petition, the Lindemans alleged that Alexis was incapable of caring for Sophia and that they were Sophia's *de facto* custodians under Indiana law (Ind. Code Ann. §31–9–2–35.5 (LexisNexis 2007)) as her financial providers and primary caregivers. The petition referred to Andrew as Sophia's "alleged father" and asserted that Andrew had never established paternity and had not participated in Sophia's life, other than visiting her twice since her birth.

On April 11, 2006, a hearing was held in the Indiana court by Judge Karen M. Love. The Lindemans were present, along with Alexis' mother, Kathy Engle. Neither Alexis nor Andrew appeared; however, the Lindemans represented to the court that Alexis was served with notice, as they hand-delivered notice to her in Illinois and verbally advised her of the date of the hearing. Andrew was not served. The record demonstrates that an attorney telephoned the court on Alexis' behalf and asked for a continuance, which the court ultimately denied. The court indicated that it would "ordinarily" grant a continuance, but "because of the allegations in the petition–I want to hear evidence on whether or not there is an emergency such that I should act even for a brief period of time." Before the hearing commenced, the trial court stated that it would "need to have *** testimony that shows I have jurisdiction, that we have notice."

With respect to the issue of notice, John testified that he and Yvonne went to Illinois the previous day and took papers to Alexis notifying her of the emergency petition and court proceeding. John stated that he handed the documents to Alexis and specifically advised her of the date and time. He even offered to bring her back to Indiana so she could attend. Alexis declined this offer and opted to

arrange her own transportation. John explained that Andrew was not present when he gave Alexis the notice documents.

John also testified about Alexis' care of Sophia since Sophia's birth. He stated that he and Yvonne took Alexis and Sophia in when Sophia was 10 days old. They wanted Alexis to finish her education and have a place to live with Sophia "worry free." As a result, the Lindemans assumed all financial responsibility for Sophia, and purchased everything she needed with the exception of formula, which was provided by the government. John stated that he and Yvonne "took care" of the baby and "basically raised" her. John explained, by way of example, that Alexis only bathed the baby two to three times while living in the Lindemans' home. Alexis would care for Sophia when John and Yvonne were at work, but they would care for the baby when they were at home. John summarized the situation by stating: "[w]hen we were there, we were it" in terms of Sophia's care. John stated that Alexis could not take care of the baby without help. John added that Alexis made poor life decisions, which he feared would jeopardize Sophia.

John testified that Andrew was not present when Sophia was born and had only seen Sophia twice since her birth. Andrew made no effort to establish paternity of Sophia. Alexis had considered seeking child support from Andrew, but was reluctant to do so because she had concerns about a member of Andrew's family having access to Sophia if Andrew paid support and was awarded visitation. Despite these concerns, Alexis moved to Illinois and now lives in the same house as the family member in question. John expressed concern over the living conditions in Andrew's home. Specifically, John pointed out that there were several adults in the home, including Andrew's grandparents, father, and sister, in addition to Andrew and Alexis, and none of them were employed.

Kathy Engle, Alexis' mother, testified that Alexis is emotionally "troubled" and "unstable," and is not equipped to care for a child. Kathy explained that Alexis was in special education classes as a child. Alexis went to school through the twelfth grade, but did not graduate from high school because she was unable to pass her classes. She did not get her driver's license until she was 22 years old because she could not pass the written test. Kathy feared that Alexis would hurt herself or the baby, and at times when Alexis and Sophia stayed

with her, Kathy was apprehensive about going to work and leaving Alexis alone with Sophia. Kathy did not provide a specific reason for her fears. Kathy questioned Alexis' desire to care for Sophia, stating that Alexis just wants to watch television and play video games. Kathy recounted a time at her home when she suggested that Alexis give Sophia a bath. Alexis replied: "I don't do baths." Kathy explained that she did not believe Alexis had a bond with Sophia. It seemed as though Alexis resented having to care for Sophia and was not inclined to meet Sophia's needs.

Yvonne testified that Alexis never bonded with Sophia and did not perform basic tasks necessary for Sophia's care. For example, Alexis would not feed Sophia her cereal because Alexis could not watch television while she fed Sophia. Instead, Alexis would call Yvonne at work and ask her when she was coming home, stating that Sophia needed her cereal. Sometimes, Alexis would stand outside with Sophia and wait for Yvonne to get home. Yvonne added that Alexis did not always dress Sophia appropriately for the weather and did not track when she fed or changed Sophia because Alexis had difficulty telling time. Additionally, Yvonne pointed out that Alexis once rented four movies to watch while the Lindemans were at work and Alexis was supposed to be caring for Sophia. Yvonne expressed concern over Alexis' ability to make good decisions for Sophia. She also stated that she was "afraid" that Sophia was in physical danger because "these people [Andrew's family] don't work. *** There is no money in this town. What happens when these people [Andrew's family] get tired of giving them [Alexis and Sophia] their last cent? You know, *** [WIC] doesn't provide cereal."

After Yvonne's testimony, the trial judge inquired to all the parties about an allegation in the petition asserting that Alexis suffered from panic attacks. Kathy responded to the question by stating that Alexis had a panic attack when she was three months pregnant and was taken to the hospital as a result. After Sophia's birth, Alexis was unable to attend a planned appointment with Kathy because she had a panic attack. Yvonne testified that she believed Alexis had a panic attack in the doctor's office when she was being treated for a spider bite. There was no indication that a medical professional diagnosed that episode as a panic attack.

After hearing this evidence, the trial judge ruled as follows:

"Petitioners have established that they, by their testimony, that they served Alexis Lindeman with the notice of today's hearing. And that is somewhat confirmed by the telephone call from attorney, [*sic*] Goetten, from Illinois. We had a recorded message on our recorder, which one of my staff typed up for me. Uh, the parties have also shown that they do meet the statutory definition of De Facto Custodians, in that they um, were the primary caretakers and providers for the minor child, Sophia Alexis [*sic*] Lindeman. Uh, noting that Alexis is absent and the general testimony indicating that she is somewhat, I guess I was to say, challenged, I think the legal proceeding probably would be a difficult situation for her. I am going to grant you an emergency custody order today, with provision for another hearing where Alexis would have the opportunity to challenge that."

The court added that "the testimony concerning the bonding with the child and the very rapid changes, and what is obviously the stress of both grandparents, and step-grandmother who, who are obviously distressed here today *** I think *** you have established on an emergency basis, clear, convincing evidence that the minor child, Sophia Grace, needs someone appointed as her legal custody [*sic*]."[1]

Turning to the issue of jurisdiction, the court stated: "I have some reservation about the Court's jurisdiction since she's moved, although I think certainly Illinois with just a couple of weeks, couldn't possibly have jurisdiction on a time frame here. So I think Indiana would have to be the logical place."

The court entered a typewritten order wherein it granted temporary custody of Sophia to the Lindemans; appointed a guardian *ad litem* for Sophia; ordered that Sophia be immediately brought to Indiana; created a schedule of supervised parenting time for Alexis; and set a hearing for April 18, 2006, "to provide Alexis Lindeman with another opportunity to be heard." Copies of the court's order were sent to Alexis and attorney Goetten. Andrew was not included in the distribution.

---

[1]The record provided to the court is missing a page of the transcript following this portion of the court's comments.

On the same date that the hearing was held on the Lindemans' emergency petition in Indiana, Andrew presented his petition to establish paternity in the circuit court of Greene County, Illinois. The matter proceeded before Judge James W. Day. Andrew's counsel presented Judge Day with documents filed in Indiana, as well as Judge Love's court order, entered earlier that day. After reviewing those documents and questioning Alexis and Andrew, Judge Day found that Andrew's paternity had been established and entered an order to that effect. Judge Day, however, stated that he was not willing to take any other action in the case because of the matters pending in Indiana. He recused himself and reassigned the case to Judge Lois A. Bell.

On April 17, 2006, Alexis filed a motion to dismiss the custody action filed by the Lindemans for lack of personal jurisdiction and insufficiency of process in the Indiana court. In that motion, Alexis alleged that she was a resident of the State of Illinois prior to the filing of the Lindemans' petition and, therefore, was not subject to the laws of Indiana. Alexis further alleged that she was not properly served pursuant to Indiana service rules. Alexis added the following information to the petition:

> "6. On April 11, 2006, ANDREW COCHRAN, the biological father of the Minor Child, filed a Petition to Determine the Existence of the Father and Child Relationship before the Circuit Court of the Seventh Judicial Circuit in Greene County, Illinois. A copy of said pleading is attached hereto as Respondent's Exhibit A. Within the terms of said petition, ANDREW COCHRAN sought to establish paternity over the Minor Child.

> 7. Subsequent to ANDREW COCHRAN'S filing on April 11, 2006, the Illinois Court found that ANDREW COCHRAN is the biological father of the Minor Child. A transcript of these proceedings is attached hereto as Respondent's Exhibit B."

Alexis appeared in the Indiana court on April 18, 2006, for the scheduled hearing on the Lindemans' emergency petition for temporary custody. The record demonstrates that a hearing was actually held on that date, but the record does not contain a transcript of the proceeding. The record does demonstrate that the Indiana court

entered a written order on April 18, 2006, which stated in relevant part:

"ORDER OF HEARING HELD 4/18/06

On April 18, 2006 this case came before the Court for further hearing on Verified Emergency Petition for Custody of the Minor Child, Sophia [G.L.] filed by Petitioners. The petitioners, John and Yvonne Lindeman were present in person and by counsel. *** Respondent, Alexis Ann Lindeman[,] was present in person and by counsel. *** The court heard testimony from Alexis Lindeman.

The Court orders the following:

* * *

2. Each party shall file a brief with the court by 4/24/06 at 4:00 p.m. regarding the issue of jurisdiction.

3. Court does not find Respondent, Alexis Lindeman[,] in contempt of court for not following its Order of 4/11/06.

4. Alexis Lindeman shall return the minor child, Sophia [G.L.,] to Petitioners within twenty-four (24) hours of this Order.

5. Respondent is ordered to immediately schedule an appointment with Joyce Lowry, Guardian Ad Litem.

6. Court reporter shall prepare a transcript of the 4/11/06 emergency hearing and provide copies to each party and GAL.

7. Further hearing is set for 4/26/06 at 8:00 a.m. as first choice with one full day allotted.

ALL OF WHICH IS ORDERED this 18th day of April, 2006."

Alexis did not return Sophia to the Lindemans as ordered. On April 19, 2006, the Lindemans filed a verified emergency petition in the Indiana court asking that Alexis be held in contempt, that a bench warrant be issued for Alexis' arrest, and that an Amber alert be issued for return of Sophia.

On April 21, 2006, Andrew filed a verified emergency petition for joint custody of Sophia in Illinois. In the petition, Andrew stated that he and Alexis, Sophia's parents, reside in Illinois; that Sophia resides

in Illinois; that he and Alexis were fit to have custody of Sophia; and that it was in Sophia's best interests that they have custody. Andrew also stated that an order for custody of Sophia was "pending" in Indiana. The Illinois court entered a temporary custody order on that date, awarding Alexis and Andrew temporary joint custody of Sophia pending a hearing. The court then continued the matter until April 24, 2006, for a custody hearing.

On that same day, April 21, 2006, the Indiana guardian *ad litem*, Joyce Lowry, sent a letter to Judge Love expressing her concern for Sophia's well-being. In the letter, Lowry reported that Alexis did not appear for her scheduled appointment on April 20, 2006, and did not call to cancel. Lowry further reported that "according to the grandparents" Alexis has "limited knowledge of child rearing & has not been involved in [*sic*] a daily basis for the care of the child." Lowry discussed a report by the grandparents that, in the past, when Alexis visited with Andrew, she contacted the grandparents and advised them that she did not have formula or diapers and counted on the grandparents to bring the items because "they" had no money. Lowry also indicated that Alexis "admitted" that Andrew "does not know how to take care of the baby" and that the baby was not eating cereal. Lowry did not state when or under what circumstances this admission was made. Finally, Lowry reminded the court that Alexis has "some developmental issues which inhibit her decision making of the welfare of the child" and stressed that Sophia needed to be returned to her grandparents.

In light of Lowry's report, the Indiana court contacted Judge Day, who entered the paternity order in Illinois, and related the concerns of the guardian *ad litem* and the court regarding Sophia's safety. Judge Day agreed to arrange for a safety check of Sophia to be conducted by Illinois authorities and advised that the matter had been transferred to Judge Bell. The Indiana court then entered a written order discussing the history of the case and the steps taken by the court to ensure Sophia's safety. The court also stated:

> "On April 17, 2006, attorney Jeremy Gooch entered an appearance for Alexis Lindeman. In his motion, Mr. Gooch notified this Court that on April 11, 2006 Andrew Cochran filed a Petition to Determine the Existence of the Father And Child Relationship before the Circuit Court of the Seventh

> Judicial District in Greene County, Illinois and on April 11, 2006 that Court determined that Andrew Cochran is the biological father of Sophia [G.L.]"

Finally, the court stated:

> "Safety of the seven month old child is the only emergency issue. Once safety is established a determination as to which state has jurisdiction can be made after all interested parties have an opportunity to be heard."

The court entered an additional order on April 21, 2006, acknowledging Andrew's parentage, declaring Andrew an indispensable party to the cause of action, and ordering Andrew to personally appear at a hearing set for April 26, 2006, in Indiana. The court stated in the order that the court would grant a continuance requested by any party "if this Court receives reassurance that Alexis Lindeman and Andrew Cochran are cooperating with the Illinois Court and that Sophia [G.L.] is safe."

On April 24, 2006, a hearing on Andrew's emergency petition for joint custody was held in Illinois by Judge Bell. Andrew testified that he is 21 years old and is Sophia's father. He, Alexis, and Sophia live with his grandparents in their home. The home is clean and a family member is always present to take care of Sophia. Andrew explained that he was unemployed and was supported by his father and grandmother. They support Sophia as well. Andrew stated that Sophia was healthy and well cared for. He added that Sophia had a doctor in Illinois and that he would take Sophia to the doctor if she needed care. Alexis testified that she is usually with Sophia and could assure the court that Sophia was well cared for. She added that the Cochran family provides financial support for her and Sophia, and she believed that support would continue.

Jeannie McCartney, a child protection investigator, also testified. She stated that she interviewed Alexis and Andrew just before the court hearing, and her preliminary assessment was that Alexis and Andrew were "very stable." She added that she would be going to their home later that day for further assessment and would offer them any assistance necessary.

A report prepared by Bruce Mindrup, Ph.D., of Mediation Services of Mid-Illinois was submitted to the court. Mindrup reported

that he interviewed Andrew and Alexis at the request of Andrew's counsel and observed their interaction with Sophia. Sophia appeared to be clean, neat, and appropriately dressed. Mindrup opined that Andrew and Alexis interacted appropriately with Sophia and were attentive to her needs.

The Illinois court found that it had jurisdiction over the parties and ruled that Illinois was the appropriate jurisdiction for a custody determination. The court then found that it was in Sophia's best interests for Andrew and Alexis to be granted temporary joint custody. The matter was continued for a permanent custody hearing.

Although the Indiana court scheduled a hearing on the issue of custody for April 26, 2006, and ordered all indispensable parties appear, there is no indication in the record that any such hearing took place. Based on Judge Love's April 21, 2006, order, it can be presumed that the Indiana court obtained assurances of Sophia's safety and continued the matter.

On April 28, 2006, the Lindemans filed two motions: an emergency limited petition to intervene in the Illinois proceedings and an emergency motion to dismiss Andrew's petition to determine existence of a father and child relationship for lack of jurisdiction. In their motion to dismiss, the Lindemans alleged that Illinois did not have jurisdiction over any proceedings concerning custody of Sophia under the provisions of the UCCJEA. After hearing arguments on the motions, the trial court granted the Lindemans' petition to intervene. The court reserved ruling on the Lindemans' motion to dismiss. In doing so, the court stated:

> "I believe under the UCCJEA that Indiana does, in fact, have jurisdiction as home state. However, I think also under the UCCJEA this Court has the discretion to contact the Indiana Court and ask them to decline jurisdiction. *** Mr. Cochran lives here and has lived here. Ms. Lindeman now lives here and the baby, in fact, lives here. Seems to me, the best evidence is going to be here. *** At the prior hearing this Court did take testimony from Ms. McCartney, a worker at the Illinois Department of Children and Family Services[,] and I made a specific finding that I found Sophia to be in a safe environment. I also heard testimony from both the father and the mother and, in fact, Sophia was in open court that

day, appeared to be healthy, happy, appropriately dressed. So, what the Court intends to do is contact Judge Love in Hendricks County, Indiana and request that she decline jurisdiction over this child."

The record demonstrates that Judge Bell called Judge Love on May 3, May 4, May 5, May 8, May 12, May 19, and May 26, 2006. None of these calls were returned. Judge Bell also called Judge Love on June 2, 2006. A member of Judge Love's staff returned this call and stated that Judge Love would contact Judge Bell on June 16, 2006.

On June 13, 2006, the Lindemans filed an emergency petition in Indiana asking the court to make a decision to retain jurisdiction. There is no indication that Andrew or his counsel received notice of the filing of this petition, although Alexis did receive notice. In that petition, the Lindemans alleged that Alexis contacted them and stated that she wanted to return to Indiana because Andrew was not helping her with the care of Sophia; that Andrew would not purchase needed medicine for Sophia; and that Andrew's sister had threatened Alexis with bodily harm if she left with Sophia.[2] On June 15, 2006, the Indiana court entered an "Order Retaining Jurisdiction." The order was not entered pursuant to a hearing. Rather, "[t]he Court, after reviewing the motions, briefs and law" found that Indiana possessed jurisdiction to determine custody of Sophia and expressly stated that the court intended to retain jurisdiction. The Indiana court specifically requested that the Illinois court "recognize the authority" of the Indiana court and "give full faith and credit" to the Indiana court's order. The Indiana court then ordered the immediate return of Sophia to the Lindemans and further ordered that the Hendricks County, Indiana, sheriff contact the appropriate Illinois law enforcement agency to effectuate Sophia's return. Finally, the Indiana court scheduled a hearing "to determine preliminary issues of custody, parenting time, support, etc." for July 25, 2006.

---

[2]Alexis and her attorney filed affidavits prior to the hearing indicating that Alexis was remaining in Illinois by choice and that it was her desire to live with Andrew and raise Sophia with him.

The Illinois court received notice of the Indiana court's order, and on that same day, June 16, 2006, Judge Bell made a docket entry declining jurisdiction and vacating the prior temporary custody order "[b]ased upon the order of the Hendricks County Indiana Superior Court entered this date."

The record shows that Judge Love failed to call Judge Bell on June 16, 2006, as promised. Nevertheless, Judge Bell still continued her attempts to discuss the case with Judge Love. On June 16, 2006, Judge Bell sent two letters to Judge Love, via fax. In the first letter, Judge Bell respectfully requested that Judge Love decline jurisdiction. In the second letter, Judge Bell attached documentation of her repeated attempts to reach Judge Love by phone, and reiterated her desire to discuss the matter with Judge Love "as the UCCJEA suggests." The letters went unanswered.

On June 19, 2006, the Lindemans filed, in the Illinois court, an emergency petition to register the Indiana court's orders of April 11, 2006 (order awarding the Lindemans emergency temporary custody of Sophia); April 18, 2006 (order entered after hearing testimony from Alexis requiring Alexis to return Sophia within 24 hours); April 21, 2006 (orders declaring Andrew an indispensable party and detailing communication with Illinois court to ensure Sophia's safety); and June 15, 2006 (order finding that Indiana had jurisdiction, intended to retain jurisdiction and required the return of Sophia the Lindemans within 24 hours). The Lindemans also filed a petition for expedited enforcement of the Indiana child-custody determination. The matter was ultimately set for hearing on September 20, 2006. Prior to the hearing, the Lindemans moved for an emergency writ of prohibition, *mandamus*, or supervisory relief in this court. We denied their requests for relief.

Judge Bell sent letters to Judge Love on June 23, 2006, and August 21, 2006, asking Judge Love to decline jurisdiction in this matter. Judge Love did not respond.

On September 13, 2006, Andrew filed a contest to registration of the Indiana child custody determination. Andrew asserted that the order awarding custody to the Lindemans was flawed because the Lindemans lacked standing; the emergency petition for temporary guardianship included fraudulent allegations; if Alexis was unfit, custody of Sophia rested with Andrew under the superior-rights

doctrine; and Indiana lacked jurisdiction. Andrew also argued that Illinois was a more convenient forum for the custody determination because the evidence was located in Illinois.

A hearing to determine whether the foreign judgment should be registered was commenced on September 20, 2006. The Illinois court heard arguments from the parties and heard from the Illinois guardian *ad litem*, Thomas Piper. Piper stated that he was "very much opposed" to the child being removed to Indiana. He urged the court to take steps to ensure that a "full evidentiary hearing with both parties being present" occurred in Illinois. The trial court judge stated:

> "[F]ollowing the hearing that we held in June *** I attempted to contact Judge Love for, between 4 and 6 weeks by telephone. I have had multiple correspondences to her asking her to decline jurisdiction. Not one single other letter has she ever responded to. She never returned a telephone call. I find that bordering on unethical, certainly unprofessional. It's anticipated under the Uniform Child Custody Jurisdiction Act that Judges are supposed to talk to one another. She has absolutely refused to do that. I indicated to her in writing that if she had some way to assure me that she had jurisdiction, that I would decline jurisdiction. That's what I did, according to what the statute tells me I am supposed to do. However, at this point she is [*sic*] failed to respond to me. *** This child is in Illinois. This child's mother is in Illinois. This child's father is in Illinois. ***[T]hose are the 3 parties that are the most important to this. I understand there is an order out in Indiana. That order was entered with no notice to the father. It was entered with only a notice handed by Mr. Lindeman to the mother. ***[T]hat is not proper personal jurisdiction over either one of these parents. At the time that the order was entered, these parents were living in Greene County, Illinois, both of them. So, while Indiana may have had subject matter jurisdiction by being, by having been the residence of Sophia, I do not find that that order, whatsoever, is enforceable against either the father or the mother. That's in short, I am going to deny the Petition to Register the Foreign Judgment. I informed Judge Love of that in writing several weeks ago. I asked her again if she would contact me to discuss it, if

Indiana law was any different with respect to personal jurisdiction. She failed to do so. As far as I am concerned, the case stays here."

The Lindemans appealed.

The appellate court reversed the trial court's decision with one justice dissenting. 371 Ill. App. 3d 833. The appellate court looked to the provisions of the UCCJEA, which set forth three circumstances in which a contest to registration will be successful. 371 Ill. App. 3d at 838. The appellate court concluded that Andrew failed to meet his burden of proving that any of these circumstances existed in this case. 371 Ill. App. 3d at 838.

The dissent pointed out that the Indiana judge ignored the dictates of the UCCJEA when she refused to communicate with the Illinois judge. The dissent also questioned whether Indiana had jurisdiction over Alexis, Andrew, or Sophia when the temporary custody order was entered, as none of them resided in Indiana at that time. Finally, the dissent concluded that the Indiana temporary custody order was void because Andrew and Alexis were not given proper notice. Because the Illinois court was not required to recognize a void order, the dissent concluded that the trial court's decision should be affirmed. 371 Ill. App. 3d at 840-41 (Myerscough, J., dissenting).

We granted Andrew's petition for leave to appeal. 210 Ill. 2d R. 315.


ANALYSIS

The parties agree that the sole issue before this court is whether Illinois is bound to register the orders of the Indiana court. The parties agree that our consideration of the registration issue is governed by the UCCJEA (750 ILCS 36/101 *et seq*. (West 2004)). This issue presents a question of law which we review *de novo*. *People v. Johnson*, 206 Ill. 2d 348, 359 (2002).

Section 305 of the UCCJEA sets forth the procedure for registering a child-custody determination issued by another state. 750

ILCS 36/305(a), (b), (c) (West 2004).[3] The statute also provides a mechanism by which another state's child-custody judgment can be contested in Illinois. 750 ILCS 36/305(d) (West 2004). Section 305(d) of the UCCJEA provides:

> "(d) A person seeking to contest the validity of a registered order must request a hearing within 20 days after service of the notice. At that hearing, the court shall confirm the registered order unless the person contesting registration establishes that:
>
> > (1) the issuing court did not have jurisdiction under Article 2;
> >
> > (2) the child-custody determination sought to be registered has been vacated, stayed, or modified by a court having jurisdiction to do so under Article 2; or
> >
> > (3) the person contesting registration was entitled to notice, but notice was not given in accordance with the standards of Section 108 [750 ILCS 36/108], in the

---

[3]The statute provides that a child-custody determination issued by a court of another state may be registered in this state if certain documents are presented to the Illinois court. 750 ILCS 36/305(a) (West 2004). The statute then provides that, on receipt of the documents, the registering court "shall" file the foreign judgment and provide notice to the necessary parties. See 750 ILCS 36/305(b) (West 2004). The parties are then provided 20 days to contest the confirmation of the registered judgment. 750 ILCS 36/305(d) (West 2004). In this case, the trial court declined registration of the judgment, even though the relevant documents were filed, and Andrew's contest was a contest to registration, rather than a contest to confirmation of a registered judgment, as the UCCJEA contemplates. See 750 ILCS 36/305(d) (West 2004). The parties do not allege that the trial court's decision to decline registration was erroneous on the procedural ground just discussed. The parties' arguments are entirely substantive, and focus only on whether Andrew's contest has merit under section 305(d)(1) or (d)(3) of the UCCJEA. 750 ILCS 36/305(d)(1), (d)(3) (West 2004). We note this procedural issue for purposes of clarity only, and proceed by considering the substantive issues raised by the parties.

-15-

proceedings before the court that issued the order for which registration is sought."

Andrew contends that the trial court had two bases for sustaining his contest to registration of the Indiana court's orders in this case under section 305(d) of the UCCJEA. First, Andrew maintains that the Indiana court did not have jurisdiction over Sophia or her parents. See 750 ILCS 36/305(d)(1) (West 2004). Next, Andrew asserts he was a person entitled to notice of the custody proceeding, but he did not receive notice as was required by the UCCJEA. See 750 ILCS 36/305(d)(3) (West 2004). The Lindemans respond that Indiana was Sophia's home state at the time the custody proceeding was initiated and, therefore, Indiana had jurisdiction over the matter. Further, the Lindemans argue that Andrew was not entitled to service at the commencement of the custody proceeding because, at that time, he had not established paternity. The parties agree that the Indiana custody determination was not vacated, stayed, or modified by a court having jurisdiction and, therefore, section 305(d)(2) is not an issue in this case. See 750 ILCS 36/305(d)(2) (West 2004). We consider the issues raised by the parties in turn.

Section 201 of the UCCJEA provides, in relevant part:

"(a) Except as otherwise provided in Section 204 [temporary emergency jurisdiction[4]], a court of this State has jurisdiction to make an initial child-custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent

---

[4]Section 204 of the UCCJEA, the temporary emergency jurisdiction portion of the statute, does not apply in this cause of action even though the Indiana custody determination was initially made on a temporary emergency basis. Section 204 only applies when the child is present in the state where the petition for temporary emergency jurisdiction was filed. See 750 ILCS 36/204 (West 2004). There is no dispute that Sophia was living in Illinois, not Indiana, when the custody proceeding in question was commenced.

-16-

continues to live in this State[.]" 750 ILCS 36/201(a) (West 2004).

Andrew asserts that Indiana was not Sophia's home state when the Indiana proceedings were commenced because it is undisputed that Sophia was living in Illinois at that time; therefore, Indiana could not exercise home state jurisdiction. The Lindemans do not contest that Sophia was living in Illinois when they commenced the instant action. Instead, the Lindemans assert that Indiana had jurisdiction because Indiana was Sophia's home state for six months immediately prior to the commencement of the proceeding and persons acting as Sophia's parents continued to the live in that state. Andrew admits that Sophia lived in Indiana for six months prior to the commencement of the custody proceeding, but asserts that Indiana still did not have jurisdiction because no parent, or person acting as a parent, remained in Indiana.

The facts of this case show that the Lindemans were declared *de facto* custodians of Sophia by the Indiana court on April 11, 2006, based on evidence presented by the Lindemans and Kathy Engle indicating that the Lindemans were Sophia's primary caretakers and financial providers. Under Indiana law, *de facto* custodian "means a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least: (1) six (6) months if the child is less than three (3) years of age." Ind. Code Ann. §31–9–2–35.5 (LexisNexis 2007). Section 102 of the UCCJEA does not use the term "*de facto* custodian," as Illinois law does not recognize *de facto* custodian status. Instead, the UCCJEA uses the term "person acting as a parent"and defines that term to mean:

"a person, other than a parent, who:

(A) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of the child-custody proceeding; and

(B) has been awarded legal custody by a court or claims a right to legal custody under the law of this State." 750 ILCS 36/102(13) (West 2004).

The UCCJEA defines "physical custody" as "the physical care and supervision of a child." 750 ILCS 36/102(14) (West 2004).

The Indiana court found, based on the evidence it heard at the April 11, 2006, hearing on the Lindemans' emergency petition for temporary custody, that the Lindemans were persons other than a parent who had physical custody of Sophia for six consecutive months within one year of the child-custody proceeding, and that the Lindemans were claiming a right to custody as *de facto* parents. Andrew asserts that the Indiana court's factual determination was incorrect. He maintains that Alexis was responsible for Sophia's physical care and supervision since Sophia's birth and that the evidence presented to the Indiana court demonstrated that she never relinquished those duties. Andrew points to testimony from the Lindemans explaining that Alexis took care of Sophia while they worked as support for this position. The Lindemans argue that the Indiana court's judgment was proper based on the evidence presented.

It is not within the purview of this court to review the credibility assessments of the court of another state for purposes of assessing error, and the UCCJEA does not instruct us to undertake such an endeavor. The UCCJEA is narrowly drafted to provide a mechanism by which courts can review legal determinations, such as jurisdiction and service, when deciding whether another state's custody order should be registered in Illinois. See 750 ILCS 36/305(d) (West 2004). However, the UCCJEA does not provide a mechanism for relitigation or review of another state court's fact determinations. See 9 U.L.A. § 101, Comment, at 657 (1999). At oral argument, Andrew's counsel invited this court to review the Indiana court's factual determination that the Lindemans were persons acting as Sophia's parents for purposes of section 201 of the UCCJEA under a manifest weight standard, and urged us to find that the Indiana court's judgment was erroneous. We decline this invitation. We note, however, that even if we were to consider the evidence for this purpose, we would still be bound by the Indiana court's factual findings because the evidence in the record available to us consists of testimony from the Lindemans and Kathy Engle, and is favorable to their position. Any testimony heard by the Indiana court which would present a contrary position, such as testimony given by Alexis, was not made part of the record.

Thus, in determining whether Indiana had home state jurisdiction over this matter pursuant to section 201 of the UCCJEA, we only consider whether Sophia resided in Indiana for six consecutive months prior to the commencement of the custody proceeding and whether a parent or person acting as a parent continued to reside in the state. See 750 ILCS 36/201(a) (West 2004). We accept the Indiana court's factual assessments as they relate to those issues, and thus conclude that the jurisdictional requirements set forth in section 201 of the UCCJEA were met in this case and that the Indiana court did, in fact, have home state jurisdiction. Accordingly, Andrew's contest of registration on this basis must fail.

We turn to Andrew's assertion that his contest to registration of the Indiana order should have been sustained because he was not served with notice of the proceedings even though he was entitled to such notice. As previously stated, under section 305(d)(3) of the UCCJEA, Illinois can sustain a contest to registration of the Indiana court's custody determination if "the person contesting registration was entitled to notice, but notice was not given in accordance with the standards of Section 108 [750 ILCS 36/108], in the proceedings before the court that issued the order for which registration is sought." 750 ILCS 36/305(d)(3) (West 2004). Section 205 of the UCCJEA provides guidelines for determining whether a person is entitled to notice of the child-custody proceeding. Section 205(a) states:

> "Before a child-custody determination is made under this Act, notice and an opportunity to be heard *** must be given to all persons entitled to notice under the law of this State, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child." 750 ILCS 36/205(a) (West 2004).

With this provision in mind, we address Andrew's notice arguments.

Andrew asserts that he was entitled to notice under section 205(a) of the UCCJEA because he had physical custody of Sophia. As previously stated, the term "physical custody" is defined in the UCCJEA as "physical care and supervision of a child." 750 ILCS 36/102(14) (West 2004). It is undisputed that Sophia was living with Andrew when the Indiana child-custody proceeding was commenced. However, there is no evidence in the record that Andrew was responsible for Sophia's physical care and supervision. The evidence

presented simply established that Andrew and Sophia lived under the same roof and that Sophia was being financially provided for by Andrew's family. The fact that Andrew and Sophia were living in the same home is insufficient to establish that Andrew was entitled to notice under section 205 of the UCCJEA as a person having physical custody of Sophia. See 750 ILCS 36/205(a) (West 2004). If we concluded otherwise, then every person living in the Cochran household would have likewise been entitled to notice.

Andrew next contends that he was entitled to notice of all of the Indiana child-custody proceedings as Sophia's presumed father because all of the parties involved in the proceedings knew that he was Sophia's father. Andrew points out that the Lindemans stated that he was the alleged father in their emergency petition for temporary custody, and the record shows that the Lindemans acknowledged that he was Sophia's father when they testified in the hearing on that petition in the Indiana court. The fact that the interested parties presumed that Andrew was Sophia's father is not a basis upon which Andrew can establish that he was entitled to notice. The Illinois Parentage Act of 1984 states that a man is only presumed to be the natural father of a child if: (1) he and child's natural mother have ever been married to each other and the child was born or conceived during the marriage; (2) if he marries the natural mother after the child's birth and he consents to be named as the child's father on the birth certificate; or (3) he and the natural mother signed an acknowledgment of paternity. See 750 ILCS 45/5(a) (West 2004). Andrew does not assert that he complied with any of these requirements, nor does he claim that he took any steps prior to April 11, 2006, to establish paternity. Thus, we reject his contention that he was entitled to notice of the Indiana proceedings occurring on or before April 11, 2006, the date he legally established that he was Sophia's father.

We nevertheless conclude that Andrew was a person entitled to notice, which he did not receive, under section 205 of the UCCJEA. See 750 ILCS 36/205(a) (West 2004). The facts demonstrate that the Lindemans filed their verified emergency petition for temporary guardianship on April 4, 2006. They did not serve Andrew and were not required to, as Andrew had not yet established paternity. The Indiana court granted the Lindemans' emergency petition on April 11,

-20-

2006, without hearing from the Alexis. However, the court made clear that it was granting temporary custody on an emergency basis until the court could hear from Alexis and reassess the situation with more information: "I am going to grant you an emergency custody order today, with provision for another hearing where Alexis would have the opportunity to challenge that." The matter was continued for one week, until April 18, 2006. On April 18, 2006, Alexis appeared in the Indiana court. The court heard testimony from Alexis which was not made part of the instant record. After hearing this evidence, the court concluded that temporary custody should remain with the Lindemans and ordered Alexis to return Sophia within 24 hours.

Section 205 of the UCCJEA provides that a parent whose parental rights have not been terminated is entitled to notice and an opportunity to be heard in a custody proceeding involving that parent's child. 750 ILCS 36/205(a) (West 2004). Alexis was given that opportunity in this case, as the court continued the matter from April 11 to April 18, 2006, for her to appear. In doing so, the court made clear that it was granting the Lindemans' petition without hearing from Alexis on an emergency basis, but noted that it needed to hear from Alexis and reassess whether the award of temporary custody to the Lindemans was appropriate. The court did not afford the same right to Andrew. The record demonstrates that Andrew established his parentage of Sophia in the Illinois court on April 11, 2006. On April 17, 2006, the Indiana court was apprised of this fact when Alexis filed her motion to dismiss the action for lack of jurisdiction and insufficiency of process. Alexis advised that Andrew's paternity was declared in the Illinois court in the body of the motion and attached the Illinois court's order and the proceeding transcripts. When the April 18, 2006, hearing commenced in the Indiana court, the court was well aware that Andrew was an indispensable party to the proceedings, and that Andrew did not receive proper notice. The court should have continued the matter for a short time to give Andrew notice and an opportunity to be heard, as it did for Alexis. See 750 ILCS 36/205(b) (West 2004). Instead, the court entered an order that same day reaffirming its April 11, 2006, emergency temporary custody determination by requiring Alexis to return Sophia to the Lindemans within 24 hours. No consideration

-21-

was given to the fact that Andrew was about to be deprived of his parental rights without notice.

We hold that Andrew's contest to the registration of the Indiana court's orders was properly sustained by the trial court because Andrew was not given notice and an opportunity to be heard, as section 205 of the UCCJEA requires, even though he was a parent whose parental rights had not been terminated. See 750 ILCS 36/205(a) (West 2004). We acknowledge that the April 18, 2006, order is not the only Indiana court order which the Lindemans sought to register in this state.[5] The Lindemans also sought registration of the June 15, 2006, order wherein the Indiana court declared that it had jurisdiction over this matter, intended to retain jurisdiction, and ordered the return of Sophia to the Lindemans within 24 hours. We conclude that Andrew's contest to registration should be sustained with regard to the June 15, 2006, order as well. That order was entered after the Lindemans filed a petition urging the Indiana court to assert jurisdiction and order law enforcement to remove Sophia from Illinois and return her to Indiana. Andrew was not given notice of the filing of that petition, despite the fact that Indiana had acknowledged Andrew's parentage on April 21, 2006, and ordered that he be notified at all further proceedings. Further, the Indiana court entered its June 15, 2006, order without a hearing, essentially reaffirming its judgment of April 18, 2006. More importantly, the court entered its June 15, 2006, order, which reaffirmed its prior temporary custody determination, without giving Andrew, a known parent, an opportunity to be heard in violation of section 205 of the UCCJEA (750 ILCS 36/205 (West 2004)).

Finally, although Andrew was not entitled to notice of the April 11 hearing, we note that the order for temporary guardianship entered on that date was entered on an emergency basis and the Indiana court

---

[5]The Lindemans sought to register the Indiana court's April 21, 2006, order requiring that Andrew be notified of all further proceedings, as well as a second order entered that day which outlined the steps taken by the Indiana court to assure Sophia's safety. Those orders are not referenced in the parties' briefs, and we note that those orders do not contain a child-custody determination as contemplated by section 305 of the UCCJEA. See 750 ILCS 36/305 (West 2004).

specifically articulated its intention to continue the matter to give Alexis an opportunity to challenge the judgment. We reiterate that Andrew should have been given the same opportunity. The April 18, 2006, order entered after Alexis had the opportunity to challenge the custody determination effectively supercedes the April 11, 2006, emergency judgment. Accordingly, Andrew's contest to registration of the April 11, 2006, judgment should likewise be sustained.

We will not construe the UCCJEA to require an Illinois court to recognize any judgment that would effectively deprive a father, who has properly established paternity, of his parental rights without notice or hearing. To do so would violate the explicit language of the UCCJEA, which states: "[t]his Act does not govern the enforceability of a child-custody determination made without notice or an opportunity to be heard." 750 ILCS 36/205(b) (West 2004). It would also violate the principle, embedded in our jurisprudence, that parents possess the fundamental right "to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion." *Wickham v. Byrne*, 199 Ill. 2d 309, 316 (2002).

Having concluded that the trial court properly sustained Andrew's contest to the registration of the Indiana judgment, we need not address Andrew's additional claims of error regarding the Indiana court's failure to decline jurisdiction and the court's failure to communicate with the Illinois court. We take this opportunity, however, to emphasize the importance of the communication provisions of the UCCJEA. See *In re Joseph V.D.*, 373 Ill. App. 3d 559, 562 (2007) (where an Illinois child support order was vacated due to noncompliance with the UCCJEA communication provisions). The comments to the UCCJEA state: "[T]his Act should be interpreted according to its purposes which are to: *** (2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child." 9 U.L.A. §101, Comment, at 657 (1999); see also *In re D.S.*, 217 Ill. 2d 306, 317-18 (2005). To that end, the UCCJEA is replete with provisions which either encourage or require courts to communicate with each other. See 750 ILCS 36/110, 204, 206, 307 (West 2004); see also 750 ILCS 36/112 (West 2004) (setting forth provisions for "Cooperation Between Courts").

Section 206(b) of the UCCJEA, entitled "Simultaneous Proceedings," provides in relevant part: "If the court determines that a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this Act, the court of this State shall stay its proceeding and communicate with the court of the other state." 750 ILCS 36/206(b) (West 2004). Judge Bell adhered to that statute when she called Judge Love eight times and wrote four letters. We acknowledge that Judge Love was not required to initiate communications with Judge Bell under the provisions of the UCCJEA that applied based on Indiana's position as the court with initial custody jurisdiction in this case. See 750 ILCS 36/110 (West 2004) (stating that courts "may" communicate). However, we believe that she was required to participate when Judge Bell initiated communication pursuant to the UCCJEA's mandate, and we are disturbed by her unwillingness to do so. See 750 ILCS 36/206(b) (West 2004) (mandating that the court "shall" communicate with the other court exercising simultaneous jurisdiction). The Indiana court's order would have had Sophia taken from her mother and father and brought to Indiana by law enforcement personnel. A decision of such magnitude certainly warrants a telephone conversation between the courts involved in the matter.

## CONCLUSION

For the reasons above, we reverse the judgment of appellate court, which reversed the trial court's decision to decline registration of the Indiana court's child-custody judgment. We note that our judgment does not preclude further custody proceedings in this case which comport with the requirements of the UCCJEA.

*Reversed.*