# Illinois Official Reports

## Appellate Court

---

### *Fleckles v. Diamond*, 2015 IL App (2d) 141229

---

| | |
|---|---|
| Appellate Court Caption | JAMES S. FLECKLES, Plaintiff-Appellee, v. DANIELLE J. DIAMOND, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-1229 |
| Filed | June 23, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-F-571; the Hon. Linda E. Davenport, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Phyllis J. Perko, of Law Offices of Harlovic & Perko, of West Dundee, for appellant.<br><br>Robert G. Black, of Law Offices of Robert G. Black, of Naperville, for appellee. |

| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1     In this permissive interlocutory appeal pursuant to Illinois Supreme Court Rule 306(a)(5) (eff. July 1, 2014) (appeals from interlocutory orders "affecting the care and custody of unemancipated minors"), plaintiff, James S. Fleckles, petitioned pursuant to the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 2014)) to establish paternity and obtain joint custody and visitation with his yet-unborn child. 750 ILCS 45/7 (West 2014); see also 750 ILCS 5/601 (West 2014). Defendant, Danielle J. Diamond, moved to strike and dismiss the petition (735 ILCS 5/2-619(a)(1) (West 2014)), arguing that the trial court did not have subject matter jurisdiction pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 *et seq.* (West 2014)), because, under that statute, Colorado, where the child was ultimately born and where defendant lived with the child, was his "home state" (750 ILCS 36/201 (West 2014); see also 750 ILCS 36/102(7) (West 2014)). The trial court denied Danielle's motion, and we granted her petition for leave to appeal. We affirm in part, reverse in part, and remand the cause with directions for the trial court to dismiss the custody portion of James's petition.

¶ 2                                    I. BACKGROUND

¶ 3     On July 30, 2014, James petitioned under the Parentage Act to establish paternity and obtain joint custody and visitation. He alleged that he and Danielle had engaged in a continuous sexual relationship since December 2001, that Danielle became pregnant in December 2013 with an anticipated due date of September 21, 2014, and that he was the unborn child's father. He also alleged that the couple had resided together in Elmhurst since September 2011.

¶ 4     On September 24, 2014, Danielle moved to strike and dismiss James's petition (735 ILCS 5/2-619(a)(1) (West 2014)), arguing that the court did not have "subject matter jurisdiction" over the matter because: Danielle resided in Colorado, the court did not have jurisdiction over an unborn child (as of the date James filed his petition), and the child was born (on September 15, 2014) in Colorado. Danielle further alleged that, on September 2, 2014, she had filed a paternity petition in Colorado (which she attached to her motion) and served James with the petition on September 11, 2014. She also alleged that it was her intention to permanently reside in Colorado. Danielle argued that, pursuant to the UCCJEA, a child's "home state" is the state in which the child has lived with a parent since birth; accordingly, because her child was born in Colorado and still resided there with her, Illinois did not have jurisdiction over him.

¶ 5     In his response, James argued that the trial court did have subject matter jurisdiction because: (1) Danielle resided in Illinois, not Colorado (as she had lived there only since July 27, 2014, and would not have been considered a resident for purposes of obtaining a driver's

license there until she had resided there for 90 days); (2) the Parentage Act allows an action to be brought to determine paternity *before* the birth of the child (750 ILCS 45/7(e) (West 2014) ("If an action under this Section is brought before the birth of the child, all proceedings shall be stayed until after the birth, except for service or process, the taking of depositions to perpetuate testimony, and the ordering of blood tests under appropriate circumstances.")); and (3) paternity did not hinge on the UCCJEA, because, when the proceedings commenced, there was no "home state" of the child, because both actions commenced *before* his birth and, thus, the court must look to the "significant connection" standard to determine jurisdiction, and under that standard neither party had a significant connection to Colorado (750 ILCS 36/201(a)(2) (West 2014) (UCCJEA significant-connection provision)).

¶ 6    As to Danielle's Colorado pleading, James moved to strike and dismiss it or, alternatively, requested a judicial conference. On October 16, 2014, James moved for the child's return to Illinois.

¶ 7                                    A. Hearing

¶ 8    On December 1, 2014, a hearing was held on Danielle's motion to dismiss James's petition.

¶ 9    Danielle, who appeared telephonically, testified that she has lived in Arvada, Colorado, since August 2014. She rents a townhouse and lives there with her son, and she signed a one-year lease on it in August 2014. Danielle has a Colorado driver's license, her vehicle is registered in Colorado, and she is registered to vote in Colorado. She moved to Colorado because that is where her work is and where she has a family support system–two sisters, a brother-in-law, two nephews, and a niece, all of whom live in Arvada within two miles of Danielle's residence.

¶ 10   Danielle's son was born in Denver, Colorado, on September 15, 2014. His doctors are in Arvada, and he has never "dealt with" any Illinois doctors. Danielle learned that she was pregnant in March 2014, while she lived in Tucson, Arizona (since February 2014). She saw doctors in Arizona.

¶ 11   Danielle has worked for the Socially Responsible Agriculture Project (SRAP) since the fall of 2009 as the southwest regional coordinator, addressing agricultural aspects of environmental issues, including policy and community advocate work. Her area includes Arizona, New Mexico, Utah, and Colorado. When she was hired, she was required to move to her area. Initially, she moved to Tucson, renting a condominium from James's father with James, who was already living there due to his employment with American Express. Both James and Danielle furnished the condo.

¶ 12   Danielle met James in 2000 or 2001 while they were in law school at Northern Illinois University. Danielle graduated in 2003 and became licensed in 2004. James became licensed in 2013.

¶ 13   In early 2011, the couple got engaged. Danielle lived in Arizona and paid taxes there (and James had a driver's license and was registered to vote there) until September 2011, when she and James moved to Illinois because James wanted to take care of his ill grandmother. The couple left their belongings in Arizona and continued paying association dues and utilities on the condo. They intended to return to Arizona because that is where their jobs were. While in

- 3 -

Illinois, James took a leave of absence from American Express. Danielle transitioned so she could work her job from Illinois, but she traveled back to the southwest "continually."

¶ 14    Danielle stayed in Illinois from September 2011 to December 2012. She went to Utah to be with her sister and to work from there. James did not join her. Danielle stayed in Utah, renting a room from a friend, until June 2013, when "we" went to Arizona and then Illinois. After she was back in Illinois, Danielle and James had disagreements about where they would live. James wanted to stay in Illinois, but Danielle's work was in the southwest. They agreed that, once James obtained his law license, he would start a law practice with his father in Arizona. (However, he never opened the law practice.)

¶ 15    In February 2014, Danielle left Illinois and went to Colorado for work. She stayed with her sister from February 8 to 22, 2014. Afterward, she went to Tucson for work and stayed there until May 24 or 25, 2014. In March 2014, while in Tucson, she was surprised to find out that she was pregnant. Danielle stayed at the condo, and James joined her there in April for one week. The couple fought "quite a lot." Danielle wanted to stay in Tucson and had found a house that she showed James. James wanted her to return to Illinois.

¶ 16    In late May 2014, Danielle returned to Colorado to stay with her sister for about one week, until June 4, 2014. She contemplated moving there because she was fighting with James in Tucson and she and her son would have a support system in Colorado.

¶ 17    On June 4, 2014, Danielle returned to Illinois to try to work things out with James. They did not reach an agreement. James wanted to stay in Illinois. Danielle, whose work was still in the southwest (and who was the primary breadwinner and had insurance through her work), presented to James a written proposal that, if he obtained full-time employment with benefits, she would stay in Illinois for one year; otherwise, they would move to the southwest.

¶ 18    On July 26, 2014, Danielle's parents hosted a baby shower. James did not attend, but his family attended. One day after the shower, even though she and James spoke the evening before and had made plans to meet the following day, Danielle left for Colorado. She testified that before leaving she had not decided to *move* to Colorado, even though she had already purchased a plane ticket. Danielle did not take her belongings from the Elmhurst residence the couple shared.

¶ 19    Addressing her job, Danielle testified that she was hired to work in the southwest. A letter from SRAP dated October 30, 2014, stated that it was "expected" that Danielle would relocate for her job, although another version stated that it was "requested." Danielle offered no explanation for the discrepancy. Danielle was able to work for SRAP while residing in Illinois, including from 2012 through 2014. Danielle also currently works quarter-time for Northern Illinois University, performing her duties remotely from Colorado for about 10 hours per week. In 2012 and 2013, she filed tax returns in Arizona and Illinois; in 2014, she would file in Arizona and Colorado.

¶ 20    On August 12, 2014, Danielle obtained a Colorado driver's license and registered her car there. Before that, she had an Illinois driver's license. Her mother and father currently live in Illinois, but her mother plans to retire in Colorado with her husband. In addition, two of Danielle's sisters live in Colorado; another sister lives in Wisconsin, and her brother lives in Illinois. Danielle testified that she owned property in Woodstock but sold it to her brother before she moved to Arizona. However, she also testified that the mortgage might still be in her name, although her brother makes the payments.

¶ 21    Addressing medical care, Danielle testified that she had two pregnancy-related visits in Arizona, and three in Illinois. She also received seven weeks of medical care in Colorado before her child's birth. She testified that she spent the majority of her pregnancy in Arizona and Colorado.

¶ 22    James testified that, when he learned that Danielle was pregnant in early March 2014, he went to Tucson. He remained there until May and attended Danielle's doctor's appointments with her. Danielle went to Colorado for one week in May, and James met her there to drive her back to Elmhurst, where they returned on June 4, 2014. James testified that he attended at least four of Danielle's medical appointments in Illinois.

¶ 23    In November 2013, James became a licensed Illinois attorney. He works for his father's firm in Lombard. He has resided at the same address in Elmhurst since September 2011. He does not have any connection with Colorado.

¶ 24    The trial court denied Danielle's motion to strike and dismiss for lack of subject matter jurisdiction, finding that Danielle was a permanent Illinois resident (from September 2011 to July 27, 2014). The trial court noted that, even though she took trips to Utah, Colorado, and Arizona, Danielle kept coming back to Illinois. The court also noted that she held an Illinois driver's license before she left for Colorado, she had family in Illinois, her law license was from Illinois, and she still owned property in Illinois. Her only contacts with Colorado, the court noted, were that she has been there since July 27, 2014, and she happened to deliver her child there. The court stated that the fact that her child was born in Colorado does not mean that "every other component and requirement under the UCCJEA is required to fall away." Also, the court noted that, from a "clean hands" perspective, the fact that Danielle left Illinois the day after the baby shower did not reflect well on her in the jurisdictional analysis. The court determined that James filed his action first and did so in Illinois before the child's birth. Therefore, Illinois courts had jurisdiction over the matter. Danielle appeals from this ruling.

¶ 25                    B. Colorado Proceedings

¶ 26    On December 2, 2014, one day after the Illinois court denied Danielle's motion to strike and dismiss, a Colorado magistrate dismissed Danielle's paternity petition and declined to exercise jurisdiction over the matter, based on the Illinois court's exercise of jurisdiction. (James had filed, on October 17, 2014, a motion to dismiss Danielle's petition, based on his filing the paternity petition in Illinois. Also, on November 21, 2014, the magistrate had held a phone conference with the Illinois judge over the pending petitions; no significant decisions were made.)

¶ 27    Danielle sought review of the magistrate's order, and, on February 21, 2015, the Colorado district court denied Danielle's petition for review. The district court found that the magistrate did not err in dismissing the petition without a hearing on "home state" jurisdiction and without making additional findings that Danielle alleged were necessary. The district court determined that the magistrate properly: communicated with the Illinois judge; declined to exercise jurisdiction after learning that the Illinois court had exercised jurisdiction over the initial custody determination; and, since no state had explicitly exercised "home state" jurisdiction, followed the first-in-time rule. The district court further found that the magistrate did not err in failing to make a finding as to whether Illinois had jurisdiction under the UCCJEA, as Colorado law did not require such a finding. The Illinois court's action prevented the Colorado court from exercising jurisdiction over the initial custody determination, because,

- 5 -

under the statute, the court that has made the initial custody determination generally retains exclusive, continuing jurisdiction until the child and both parents leave the state or no longer have significant connections with it. Colo. Rev. Stat. Ann. § 14-13-202(1) (West 2014). Finally, the court found that the magistrate did not err in failing to find that Colorado was an inconvenient forum, as that concept was inapplicable because Colorado was not the state with exclusive, continuing jurisdiction.

## II. ANALYSIS

Danielle argues that the trial court erred in denying her motion to strike and dismiss for lack of subject matter jurisdiction. Unlike her position in the trial court, wherein she argued that James's entire petition should be dismissed, Danielle prays on appeal that we reverse and remand with directions that only the portion of James's petition pertaining to *custody* be dismissed, because the trial court lacked jurisdiction to determine custody or because, as she asserts elsewhere in her brief, the court's order was "erroneous for lack of compliance with the requirements of the UCCJEA.") For the following reasons, we agree that the trial court erred in denying her motion with respect to custody.

Danielle's motion was brought pursuant to section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2014)). A motion to dismiss pursuant to section 2-619 admits the legal sufficiency of the complaint, but asserts certain defects, defenses, or other affirmative matters that act to defeat the claim. *Relf v. Shatayeva*, 2013 IL 114925, ¶ 20. In ruling on a section 2-619 motion, all pleadings and supporting documents must be construed in the light most favorable to the nonmoving party, and the motion should be granted only where no material facts are in dispute and the defendant is entitled to dismissal as a matter of law. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. "The purpose of a section 2-619 motion to dismiss is to dispose of a case on the basis of issues of law or easily proved issues of fact." *Hertel v. Sullivan*, 261 Ill. App. 3d 156, 160 (1994). We review *de novo* a trial court's ruling on a motion to dismiss based on section 2-619. *In re Marriage of Diaz*, 363 Ill. App. 3d 1091, 1094 (2006). Similarly, we review *de novo* questions of statutory construction (*Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 235 (2005)) and subject matter jurisdiction (*McCormick v. Robertson*, 2015 IL 118230, ¶ 18).

James filed his petition pursuant to the Parentage Act. He sought to establish paternity and obtain joint custody and visitation. The purpose of the Parentage Act is to "further the public policy of Illinois to 'recognize[ ] the right of every child to the physical, mental, emotional and monetary support of his or her parents,' without regard to the parents' marital status." *In re Parentage of John M.*, 212 Ill. 2d 253, 263 (2004) (quoting 750 ILCS 45/1.1 (West 2002), and citing 750 ILCS 45/3 (West 2002)). An action to determine the existence of a father-child relationship may be brought by "a man presumed or alleging himself to be the father of the child *or expected child*." (Emphasis added.) 750 ILCS 45/7(a) (West 2014). However, "[i]f an action under this Section is brought *before* the birth of the child, all proceedings shall be stayed until after the birth, except for service or process, the taking of depositions to perpetuate testimony, and the ordering of blood tests under appropriate circumstances." (Emphasis added.) 750 ILCS 45/7(e) (West 2014). The Parentage Act also provides that *custody and visitation* shall be determined "in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act [(750 ILCS 5/101 *et seq.* (West 2014))] and any other applicable law of Illinois." 750 ILCS 45/14(a)(1) (West

2014). The Illinois Marriage and Dissolution of Marriage Act, in turn, provides that a "court of this State competent to decide child custody matters has jurisdiction to make a child custody determination in original or modification proceedings as provided in Section 201 of" the UCCJEA. 750 ILCS 5/601(a) (West 2014). The Parentage Act's jurisdictional provision states that a "circuit court[ ] shall have jurisdiction of an action brought under this Act. In any civil action *not* brought under this Act, the provisions of this Act shall apply if *parentage* is at issue. The Court may join any action under this Act with any other civil action where applicable." (Emphases added.) 750 ILCS 45/9(a) (West 2014). As to venue, the statute provides, in relevant part, that a parentage action "may be brought in the county in which any party resides or is found." 750 ILCS 45/9(b) (West 2014).

¶ 32     We turn next to the UCCJEA. The UCCJEA, which became effective in Illinois on January 1, 2004, "was promulgated to end custody jurisdictional disputes between states, to promote cooperation between states in determining custody issues, and to enhance the ability of states to enforce custody orders expeditiously." *In re Joseph V.D.*, 373 Ill. App. 3d 559, 561 (2007). To end forum shopping by parents, the statute gives a state exclusive continuing jurisdiction once a state makes an initial child custody determination. *Crouch v. Smick*, 2014 IL App (5th) 140382, ¶ 19. Thus, the UCCJEA provides state trial courts with a method to resolve jurisdictional questions that arise in interstate child custody disputes, and the statute gives priority to the state that is the child's "home state." *Diaz*, 363 Ill. App. 3d at 1096.

¶ 33     Sections 201(a), (b), and (c) of the UCCJEA provide:

"(a) Except as otherwise provided in Section 204[, *i.e.*, temporary emergency jurisdiction], a court of this State has jurisdiction to make an initial child-custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under Section 207 or 208, and:

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under Section 207 or 208; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3).

(b) Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this State.

(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination." 750 ILCS 36/201(a), (b), (c) (West 2014).

¶ 34    The definition of "home state" is provided in section 102(7) of the UCCJEA:

" 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child *lived from birth* with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period." (Emphasis added.) 750 ILCS 36/102(7) (West 2014).

¶ 35    This provision's reference to "lived from birth" has been construed to mean the place where the child occupies a home. *In re D.S.*, 217 Ill. 2d 306, 317 (2005). The statute does not define the term "commenced."

¶ 36    The statute defines a "child" as "an individual who has not attained 18 years of age." 750 ILCS 36/102(2) (West 2014). The UCCJEA, however, does not "authorize jurisdiction over a child custody proceeding concerning an unborn child." *Waltenburg v. Waltenburg*, 270 S.W.3d 308, 316 (Tex. App. 2008); see also *In re Marriage of Skelton*, 352 Ill. App. 3d 348, 352 (2004) (under prior statute–Uniform Child Custody Jurisdiction Act (750 ILCS 35/4 (West 2002))–definition of "child" did not include fetuses).

¶ 37    Again, the UCCJEA's jurisdictional provision states that section 201(a) therein "is the exclusive jurisdictional basis for making a child-custody *determination* by a court of this State." (Emphasis added.) 750 ILCS 36/201(b) (West 2014). The statute defines a "child-custody determination" as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual." 750 ILCS 36/102(3) (West 2014).[1]

¶ 38                              A. Subject Matter Jurisdiction

¶ 39    We turn first to subject matter jurisdiction. Although on appeal Danielle now concedes that subject matter jurisdiction, strictly speaking, is not at issue, we briefly address it to avoid confusion and because Danielle's motion to dismiss was brought pursuant to section 2-619(a)(1) of the Code of Civil Procedure, the provision under which a party may raise a lack of subject matter jurisdiction. We agree that the trial court has constitutionally-derived subject matter jurisdiction over James's petition.

¶ 40    In *McCormick*, our supreme court recently reiterated several longstanding principles. The court noted that, with the exception of circuit courts' power to review administrative decisions,

---

[1]It defines a "child-custody proceeding," in contrast, as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. *The term includes a proceeding for* divorce, separation, neglect, abuse, dependency, guardianship, *paternity*, termination of parental rights, and protection from domestic violence, *in which the issue may appear*. The term does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under Article 3." (Emphases added.) 750 ILCS 36/102(4) (West 2014). Again, section 201 does *not* contain the term "child-custody proceeding."

which is conferred by statute, circuit courts' subject matter jurisdiction is conferred by our state constitution. *McCormick*, 2015 IL 118230, ¶ 19. Pursuant to section 9 of article VI of the Illinois Constitution, the jurisdiction of circuit courts extends to all "justiciable matters except when the Supreme Court has original and exclusive jurisdiction relating to redistricting of the General Assembly and to the ability of the Governor to serve or resume office." Ill. Const. 1970, art. VI, § 9. "[A] matter is considered justiciable when it presents 'a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests.' " *McCormick*, 2015 IL 118230, ¶ 21 (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335 (2002)).

¶ 41    Addressing compliance with *statutory* requirements, the court stated that this "involves an altogether different set of values. *** [H]owever, the fact that the litigants or the court may have deviated from requirements established by the legislature does *not* operate to divest the court of jurisdiction." (Emphasis added.) *Id.* ¶ 22. The court added:

> "Similarly, while the General Assembly may create new justiciable matters through legislation that create rights or duties that have no counterpart in common law or at equity, our court has made clear that *the establishment of a new justiciable matter neither extends nor constrains the court's jurisdiction*. It could not, for except in the area of administrative review, the jurisdiction of the circuit court flows from the constitution. [Citation.] So long as a claim meets the requirements for justiciability, it will be sufficient to invoke the court's subject matter jurisdiction, even if the claim is defectively stated. [Citation.] The only consideration is whether it falls within the general class of cases that the court has the inherent power to hear and determine. If it does, then subject matter jurisdiction is present." (Emphasis added and omitted.) *Id.* ¶ 23.

¶ 42    Addressing section 201 of the UCCJEA, which speaks of jurisdiction, the supreme court explained that, as used therein, "jurisdiction" means "*a procedural limit on when the court may hear initial custody matters, not a precondition to the exercise of the court's inherent authority*. It could not be more, for as we have held, that authority emanates solely from article VI, section 9, of our constitution." (Emphasis added.) *Id.* ¶ 27. "*Once a court has subject matter jurisdiction over a matter*, its judgment will not be rendered void *nor will it lose jurisdiction merely because of an error or impropriety in its determination of the facts or the application of the law*." (Emphases added.) *Id.* ¶ 28.[2]

¶ 43    Strictly construing Danielle's motion as one asserting a lack of subject matter jurisdiction, we conclude that the trial court *had* subject matter jurisdiction over James's petition. James's petition presented claims for paternity, custody, and visitation under the Parentage Act and the

---

[2]In *McCormick*, the parties entered into a joint parenting agreement after the father filed an action under the Parentage Act. Two years later, the father, who lived in Illinois, sought sole custody, and the mother, who had moved with the child from Missouri to Nevada, moved to vacate the prior judgment and dismiss the Illinois proceedings, arguing that, under the UCCJEA, the Illinois court lacked subject matter jurisdiction. The trial court found its prior order void for lack of subject matter jurisdiction. The supreme court held that the trial court erred in invalidating its initial parentage determination, as the child-custody action was a justiciable matter within the court's jurisdiction (as conferred by the constitution). *Id.*

UCCJEA. These are justiciable matters, to which the trial court's constitutionally granted jurisdiction extends. *Id.* Further, even if James's petition defectively stated his claims, the trial court would not have been deprived of subject matter jurisdiction. *Id.* ¶ 22; see *Belleville Toyota*, 199 Ill. 2d at 340.

¶ 44　　Thus, we agree that the trial court had constitutionally derived subject matter jurisdiction over James's petition.

¶ 45　　　　　　　　　　　　B. The Parentage Act and the UCCJEA

¶ 46　　Next, turning to the dispositive issue in this case, Danielle asserts that her motion to strike and dismiss is clearly based on the UCCJEA: custody determinations in Parentage Act cases, she asserts, are subject to the UCCJEA, which requires that courts exercise their jurisdiction consistently with that statute. Here, she argues, the trial court did not follow the UCCJEA's requirements and, thereby, erred in denying her motion to strike and dismiss with respect to custody matters. She requests that we reverse that portion of the trial court's order and remand for the court to dismiss that portion.

¶ 47　　Construing Danielle's motion to strike and dismiss as brought pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2014) (claim asserted "is barred by other affirmative matter avoiding the legal effect of or defeating the claim")), we conclude that the trial court erred in denying that portion related to custody.

¶ 48　　When James filed his petition, the child was not yet born. His petition was brought pursuant to the Parentage Act, which, unlike the UCCJEA, contemplates unborn children and provides that, in such a case, the proceedings are stayed until after the child's birth, "except for service or process, the taking of depositions to perpetuate testimony, and the ordering of blood tests under appropriate circumstances." 750 ILCS 45/7(e) (West 2014). Here, the first issue the trial court will likely address is paternity and, depending on its resolution, it might not need to reach the custody and visitation issues.[3] Nevertheless, the Parentage Act's jurisdictional provision states that "circuit courts shall have jurisdiction of an action brought under this Act. In any civil action not brought under this Act, the provisions of this Act shall apply if parentage is at issue. *The Court may join any action under this Act with any other civil action where applicable*." (Emphasis added.) 750 ILCS 45/9(a) (West 2014). The Parentage Act also provides that custody and visitation shall be determined pursuant to the factors in the Illinois Marriage and Dissolution of Marriage Act and any other applicable law. 750 ILCS 45/14(a)(1) (West 2014). The Illinois Marriage and Dissolution of Marriage Act, in turn, provides that a "court of this State competent to decide child custody matters has jurisdiction to make a child custody determination in original or modification proceedings as provided in Section 201 of" the UCCJEA. 750 ILCS 5/601(a) (West 2014). Thus, clearly, a Parentage Act proceeding may have joined with it a claim for custody pursuant to the UCCJEA. The question here is which state may make the initial child-custody determination where an action requesting, *inter alia*, custody is initiated before the child's birth.

¶ 49　　Here, James notes that the UCCJEA (in section 201, its jurisdictional provision) does not identify a paternity ruling as constituting an "initial child-custody determination" within its purview. It encompasses only: "a judgment, decree, or other order of a court providing for the

_____

[3]It does not appear that paternity is greatly disputed here, but we recognize that, if James is not found to be the biological father, our UCCJEA analysis will be rendered advisory.

legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual." 750 ILCS 36/102(3) (West 2014). However, James fails to note that the statute provides, with respect to custody determinations, that it contains the exclusive provisions to make such determinations.

¶ 50 We find persuasive the foreign case law upon which Danielle relies, which supports her position that James's claims be bifurcated and the child-custody determination be made in Colorado because that is the child's home state due to his birth there. In *Gray v. Gray*, 139 So. 3d 802 (Ala. Civ. App. 2013), for example, the couple had lived in Alabama. The mother then relocated to Michigan while she was pregnant. The father filed a divorce action in Alabama, and the mother subsequently delivered the couple's child in Michigan. The mother moved to dismiss the father's action, alleging that the Alabama court lacked jurisdiction to make a child-custody determination under the UCCJEA. The trial court denied her motion, and the action proceeded to trial. On appeal, the court chose to address subject matter jurisdiction, framing the first inquiry as whether Alabama was the child's home state under the UCCJEA. It noted that, when the father commenced the divorce action, the child had not yet been born. Reviewing the statutory definition of "home state," the court first held that "an unborn child cannot have a home state" and, thus, the UCCJEA does not provide a basis for jurisdiction over a child-custody proceeding involving an unborn child. *Id.* at 806. The court further concluded that, because the father had commenced the divorce action before the child's birth, the home-state determination "was necessarily *deferred* until its birth," and, because the child had lived since birth only in Michigan, Michigan was the child's home state and the Alabama court lacked subject matter jurisdiction to make an initial child-custody determination. (Emphasis added.) *Id.* at 808. Furthermore, there was no other statutory basis for the exercise of subject matter jurisdiction. *Id.*

¶ 51 In a similar case, *Waltenburg*, 270 S.W.3d 308, a Texas reviewing court noted that the commencement date is the date of the filing of the first pleading, but it held that a court cannot have UCCJEA jurisdiction over a pre-birth custody claim in a state where the child had never lived, because it would be contrary to the UCCJEA's provisions prioritizing home-state jurisdiction. *Id.* at 318. In *Waltenburg*, an Arizona couple separated while the mother was pregnant, and she moved to Texas before their child's birth. The father then filed for divorce in Arizona, seeking custody of their unborn child. (Paternity was not at issue.) The child was born in Texas and never lived in Arizona. After the child was born, the mother filed her own divorce suit in Texas, also seeking custody. The Texas trial court dismissed the mother's divorce action in deference to the father's pending Arizona action. The reviewing court first noted that jurisdiction was determined as of the date on which the suit was filed in Texas and that the child's home state was determined as of the date of the commencement of the child-custody proceeding, which was statutorily defined as the date of the filing of the first pleading in a proceeding. *Id.* at 314. In that case, in which the child was less than six months old, the home state was the state in which the child lived from birth with a parent. *Id.* The reviewing court then held that the trial court erred in dismissing the Texas suit, because the "text of the UCCJEA precludes its application to unborn children" and, thus, the Arizona court never properly obtained jurisdiction over the father's *custody* claim in his divorce action, which was filed *before* the child was born. *Id.* at 317. Texas was the child's home state on the date the mother filed the Texas suit. *Id.* at 315. When the father filed his suit in Arizona, Arizona did

- 11 -

not have jurisdiction over the custody claim. *Id.* at 318. Alternatively, the *Waltenburg* court held that, "[e]ven if we determined the Arizona court's jurisdiction as of the date [the child] was born–instead of the date Father filed suit–our conclusion that the Arizona court lacked jurisdiction over Father's custody claim does not change," because Texas immediately became the child's home state when the child was born. *Id.* The UCCJEA, the court noted, does not authorize jurisdiction over a custody claim before a child's birth. *Id.* Because the UCCJEA does not apply to unborn children and because the statute is the exclusive jurisdictional basis for making a child-custody decision, "a court in a state that has adopted the UCCJEA cannot exercise jurisdiction over a custody claim asserted regarding an unborn child" and, thus, comity did not require that Texas recognize any Arizona custody determination not made in conformity with the UCCJEA. *Id.*; see also *In re Custody of Kalbes*, 2007 WI App 136, ¶ 10, 302 Wis. 2d 215, 733 N.W.2d 648 (the husband filed for divorce in Idaho before the child's birth; the wife, who had moved to Wisconsin, gave birth to their child in Wisconsin and filed for custody afterward; the father then moved for custody in the Idaho action; the reviewing court held that Wisconsin was the child's home state because the child was born there and lived there from birth; Wisconsin had jurisdiction over the custody proceeding); c*f. Berwick v. Wagner*, 336 S.W.3d 805, 815-16 (Tex. App. 2011) (limiting *Waltenburg* to its facts and holding that, where a "pre-birth suit and the 'home state' of the child are one and the same, \*\*\* UCCJEA petitions can be filed pre-birth with the jurisdictional analysis reserved for post-birth"). But see *Barwick v. Ceruti*, 31 N.E.3d 1008 1014 (Ind. Ct. App. 2015) (pregnant wife moved to Canada from Indiana, and husband filed for divorce in Indiana and moved to preserve jurisdiction over parentage and custody issues; child was born in Canada; reviewing court held that, waiver aside, trial court did not abuse its discretion in finding that Indiana had jurisdiction over unborn child's custody; where the petition was filed pre-birth, the child did not have a home state when proceedings commenced and no other state had jurisdiction; further, although Canada later became the child's "home state," Indiana did not lose jurisdiction but could have either continued jurisdiction or deferred it to Canada).

¶ 52    The foregoing cases are persuasive, and we agree with their reasoning that a home-state determination must be deferred until the child's birth and that, upon the child's birth, the birth state–here, Colorado–becomes the home state. The trial court erred in assessing the case under section 201(a)(2)'s significant-connection analysis and the factors thereunder, such as Danielle's residence and intent. As Danielle notes, foreign cases recognize that UCCJEA "jurisdiction" does not exist prior to a child's birth and conclude that the issues in cases such as this be bifurcated and decided by different states' courts. See *In re Sara Ashton McK.*, 974 N.Y.S.2d 434, 435 (N.Y. App. Div. 2013) (citing *Waltenburg*, 270 S.W.3d at 316-17); *Gray*, 139 So. 3d at 808 (determination must be deferred until child's birth); see also *In re Dean*, 393 S.W.3d 741, 747 (Tex. 2013) (whether a Texas divorce action is filed is not relevant in determining jurisdiction over child custody because the two proceedings involve different issues; "one state may have jurisdiction over custody even if the divorce is decided by another state's court"); *DeWitt v. Lechuga*, 393 S.W.3d 113, 118 (Mo. Ct. App. 2013) ("analysis may well result in bifurcated adjudications, where one state adjudicates paternity and child support and another state adjudicates custody and parenting time"). The UCCJEA was enacted by most states pursuant to a federal kidnapping-prevention act, which, in turn, sought to "avoid jurisdictional competition and conflict between State courts" by extending full faith and credit to custody decrees entered by sister state courts. (Internal quotation marks omitted.) *Thompson*

*v. Thompson*, 484 U.S. 174, 177 (1988). To hold here that Illinois may make an initial child-custody determination, we believe, would ignore this goal and ignore that the UCCJEA gives priority to the jurisdiction of the child's "home state" (*Diaz*, 363 Ill. App. 3d at 1096), which for a child less than six months old is defined as the birth state.

¶ 53                                  III. CONCLUSION

¶ 54        For the reasons stated, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part, and the cause is remanded with directions that the custody portion of James's petition be dismissed.

¶ 55        Affirmed in part and reversed in part; cause remanded with directions.