NOTICE
Decision filed 06/29/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 251049

NO. 5-25-1049

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* PARENTAGE OF W.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Preston C., | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-FA-32 |
| | ) | |
| Zakariya S., | ) | Honorable |
| | ) | Wesley A. Gozia, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court, with opinion.
Justice Bollinger concurred in the judgment and opinion.
Justice Vaughan dissented, with opinion.

**OPINION**

¶ 1    Petitioner, Preston C., filed a petition to establish parentage regarding W.C. Respondent, Zakariya S., filed a motion to dismiss the petition for lack of jurisdiction. On November 20, 2025, following two days of testimony, the Marion County trial court denied Zakariya's motion to dismiss. Zakariya filed a petition for leave to appeal before this court. This court allowed the petition pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Oct. 1, 2020), which permits appeals from an order of the trial court denying a motion to dismiss on the grounds of *forum non conveniens*.

1

¶ 2      On appeal, Zakariya raises four issues. First, she argues that the trial court erred by failing to identify Iowa as W.C.'s home state. Second, she argues that the trial court erred by considering factors that occurred outside of the six months immediately preceding the filing of the petition to establish parentage. Third, she argues that the trial court erred by finding that Illinois, not Iowa, had significant connections as set forth in section 201(a)(2) of the Uniform Child-Custody Jurisdiction and Enforcement Act (Act) (750 ILCS 36/201(a)(2) (West 2024)). Finally, she argues that the trial court erred by failing to conduct a conference pursuant to the Act with the judge presiding in Iowa upon learning of the pending action. For the reasons that follow, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4      The evidence demonstrated that Zakariya and Preston were in a dating relationship. They became the biological parents of W.C., born in December 2020. W.C. was born in Centralia, Illinois, and resided there with his parents until October 2021. In October 2021, W.C. moved with both parents to Ottumwa, Iowa. The parties ended their relationship in March 2023.

¶ 5      Preston returned to Illinois. Zakariya remained in Iowa. W.C. traveled with Preston to Illinois in order to allow Zakariya to make childcare arrangements. In March 2023, the parties implemented an alternating parenting schedule, where each party had parenting time for a period of two weeks at a time. This schedule continued until October 2024, when W.C. was enrolled in a preschool program in Iowa. At that time, W.C. resided primarily with Zakariya. W.C. traveled to Illinois periodically for approximately a week at a time for Preston to exercise parenting time. This schedule continued until April 2025.

---

[1]This case is accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), with a disposition date of May 21, 2026. Zakariya received an extension of time to file her brief, and her brief was ultimately filed on March 16, 2026. Preston's brief was filed on April 28, 2026. We find that good cause exists for filing the decision after May 21, 2026.

¶ 6    On April 9, 2025, Preston filed a petition to establish parentage. In the petition, Preston alleged that Illinois had jurisdiction over the subject matter, where Preston resided in Marion County, Illinois. Preston sought a judgment establishing him as the natural father of W.C. and that he be awarded parenting responsibility over the educational, medical, religious, and extra-curricular needs of W.C. Preston requested majority parenting time, and he sought temporary and permanent child support from Zakariya. He also filed a verified petition for temporary relief, wherein he sought allocation of parental responsibilities and parenting time, and he sought child support.

¶ 7    On July 9, 2025, Zakariya filed a three count motion to dismiss for lack of jurisdiction under the Act "pursuant to [the Act] Sections 201, 203 & 207." In the motion, Zakariya argued that she was a resident of Iowa, and W.C. resided in Iowa since October 2021. She pointed specifically to sections 201, 203, and 207 of the Act (*id.* §§ 201, 203, 207). Zakariya filed an affidavit in support of her motion to dismiss.

¶ 8    Looking specifically at section 207 of the Act, Zakariya pointed to section 207(b)(1), alleging that the relationship between the parties ended as a result of Preston's sexual manipulation and emotional abuse. *Id.* § 207(b)(1). Turning to section 207(b)(2), Zakariya argued that W.C. "never resided within the State of Illinois for any significant length of time." *Id.* § 207(b)(2). Pointing to section 207(b)(3), Zakariya argued that the distance between Marion County and a court of jurisdiction in Iowa was significant. *Id.* § 207(b)(3). Turning to section 207(b)(4), Zakariya argued that it would be a financial hardship for her to maintain the parentage action in Illinois. *Id.* § 207(b)(4). Looking at section 207(b)(5), she noted that the parties originally moved to Iowa with W.C., and Preston returned to Illinois, alone. *Id.* § 207(b)(5). Turning to section 207(b)(6), Zakariya alleged that W.C. and "any potential witnesses are all located and/or reside in

3

the State of Iowa or outside the State of Illinois, and Iowa would be the more appropriate forum for this action." *Id.* § 207(b)(6).

¶ 9 On August 1, 2025, Zakariya filed a petition to establish paternity, custody, visitation, and support in a Wappello County trial court in Iowa. In her petition Zakariya stated, "The Petitioner and the Respondent are natural parents of the following minor child: W.C." In the petition, Zakariya alleged that Iowa had jurisdiction over the parties. She requested joint legal custody with W.C. in her primary physical care. In the pleading, Zakariya noted that "the parties are currently involved in custody proceedings in the State of Illinois, Marion County, Case number 2025-FA-32, to which [Zakariya] is contesting jurisdiction pursuant to the [the Act]." She requested child support.

¶ 10 The trial court held a hearing on the motion to dismiss on August 18, 2025. Zakariya's first witness was Tralawney Ellis. Ellis was the director of the Discovery Lane Early Childhood Child Care Center (Discovery Lane), a licensed daycare and preschool facility in Iowa. W.C. attended Discovery Lane from January 16, 2024, until he "graduated" from the preschool program on May 13, 2025. Zakariya informed Ellis that W.C. would attend a four year old preschool in the fall of 2025 in the Ottumwa area. However, the program was not part of Discovery Lane.

¶ 11 On cross-examination, Ellis testified that W.C. attended preschool "less than half the time" where in 2024, W.C. attended for 106 days. Ellis explained that Discovery Lane was open "except for major holidays" and "the week between Christmas and New Year's." Ellis testified that the center was a "full year-around day care/school year" program. She testified that W.C.'s 106 days of attendance constituted "less than half" of the days that the center was open.

¶ 12　Dr. Eric Dodson, a pediatrician at All Ages Pediatrics, next testified. Dr. Dodson was W.C.'s pediatrician since July 10, 2023. Dr. Dodson testified that he never personally examined or observed W.C. On March 25, 2024, W.C. had a nurse visit in the office and received vaccines.

¶ 13　Zakariya testified. During the first day of the hearing, Zakariya testified that there was an action pending in Wapello County, Iowa, where she resided. Zakariya also filed for child support in Iowa.

¶ 14　At the time of her testimony, Zakariya was 24 years old and worked as a federal employee in the social security office in Ottumwa, Iowa. She worked there for approximately four years. Zakariya testified that she was in a relationship with Preston from 2019 to 2023, and they had a child together.

¶ 15　Zakariya testified that she and Preston moved from Illinois to Iowa in October 2021. Zakariya, Preston, and W.C. lived together in Iowa for approximately two years. She testified that they broke up because there was "domestic violence" and "sexual concerns." Zakariya testified that "it wasn't a healthy relationship to raise a child in." Zakariya remained in Iowa, and Preston moved back to Illinois. The parties agreed to split custody equally.

¶ 16　The parties shared equal custody until 2024. Zakariya testified that they "had the conversation that I would be the primary, he would go to school in Iowa, and [Preston] decided he would like to have the summers." Zakariya testified that the two talked about this in person. Zakariya introduced a document from September 16, 2024, that memorialized a conversation "based off of the agreement that we had" that Zakariya would have custody of W.C. "the majority of the time" and Preston "would have him at least once a month for a few days, typically over the weekend." The document also indicated that Preston would keep W.C. over the summer. Zakariya testified that Preston agreed that W.C. would be enrolled in school in Iowa.

¶ 17    Zakariya testified that the parties agreed to split the cost of preschool. Zakariya requested that Preston pay child support, because it was hard for her to financially support W.C. on her own. She explained that she and Preston exchanged text messages to coordinate drop offs and pickups between homes. W.C. received health insurance through her employer in the State of Iowa. Zakariya enrolled W.C. in Pickwick Early Education for a prekindergarten program.

¶ 18    Zakariya testified that the longest period of time that W.C. remained in Illinois with Preston was in May 2025, where W.C. spent all but one week with Preston. From September 2024 to April 2025, W.C. spent most of the "Christmas month" with Preston. She estimated that W.C. spent approximately a week and a half to two weeks with Preston over Christmas 2024.

¶ 19    Zakariya testified that she and W.C. are active in the community. They attend church together through New City Church. They go to the arcade and amusement park. Zakariya testified that they "helped out with the women and children's center in Ottumwa, Iowa as volunteer work." Zakariya testified that W.C. had friends at school that he saw on a regular basis.

¶ 20    Zakariya testified that she did not have family in Iowa. The last time Zakariya was in Illinois was June 2025, when she saw her family with W.C. Zakariya's family did not see W.C. during Preston's parenting time. Zakariya testified that the distance from her home in Ottumwa, Iowa, and Preston's home in Salem, Illinois, is approximately a 5½ hour drive.

¶ 21    Tim Quick next testified. He was a commercial team leader marketing president for UMB Bank in Clive, Iowa. Quick had been in a romantic relationship with Zakariya for approximately two years. Quick had a biological daughter around the same age as W.C. Quick spent time with W.C. and his daughter by going to the fair, to church, out to eat, and to parks. Quick considered himself a community tie for W.C. to Iowa. Quick testified that W.C. was with Zakariya a substantial amount of the time, "roughly 70 percent, 75 percent."

6

¶ 22    On cross-examination, Quick testified that the goal was for Zakariya and W.C. to move to Des Moines or Clive to live with him. This would result in W.C. switching schools.

¶ 23    Samira V., Zakariya's sister, next testified. Samira testified that she lived in Centralia, Illinois. In the 4½ years prior to the hearing, she saw W.C. less than 15 times. Samira did not see W.C. when Preston had custody.

¶ 24    Preston began his presentation of evidence. He first called Harold C. Harold was Preston's father and W.C.'s grandfather. Harold testified that he had a "great" relationship with W.C. Harold saw W.C. "often when he's with Preston." The family usually had a cookout every Sunday with all seven of Harold's children. Preston and W.C. attended Sunday cookouts. Harold had a large extended family with children W.C.'s age, including other grandchildren. Harold testified that W.C. participated in T-ball, and he often went to watch him.

¶ 25    Alyssa Barringer, Preston's girlfriend, next testified. Barringer and Preston lived together and planned to marry. W.C. resided with Barringer and Preston when Preston had custody. Barringer stayed home with W.C. while Preston worked, and W.C. did not attend daycare in Illinois.

¶ 26    From October 2024 until the filing of the petition, W.C. went to the park, splash pad, and spent holidays with Preston's family. Barringer testified that on Sundays the family had cookouts at Harold's house, went to the lake, and went swimming. Barringer testified that there were many children W.C.'s age in Preston's extended family. Barringer testified that W.C. was close with his grandfather, Harold. Barringer testified that she had a good relationship with W.C. Barringer and Preston intended to purchase a home in Illinois.

¶ 27    Jada Berkel next testified. Berkel was the fiancée of Dillon C., Preston's brother. Berkel testified that the brothers had a close relationship and spent time together at least once a week.

7

W.C. spent time in Berkel's home with Preston. Berkel had a three-year-old and an almost-one-year-old who interacted with W.C. Berkel testified that the children were "close." The family spent holidays together, and W.C. attended holidays and enjoyed them. Berkel testified that W.C. was connected to Preston and to her children. Berkel testified that the majority of the family resided in southern Illinois.

¶ 28    The hearing continued to a second day on September 8, 2025. Zakariya again testified. Zakariya indicated that she "could have" her pastor from Iowa testify along with coworkers. Zakariya indicated that her coworkers were "very close" with W.C., because she often brought him to work with her. Zakariya's family resided "all over the place" with a sister in Alabama, her mother in Missouri, and her grandmother and another sister in Illinois.

¶ 29    Zakariya testified that she did not intend to remain in Ottumwa, Iowa. She intended to move to Des Moines, Iowa. She testified that if she moved, W.C. would change preschools and they would move to a new apartment. Zakariya wished to move closer to her significant other, and she hoped to receive better job promotion opportunities in Des Moines.

¶ 30    Zakariya testified that the parties did not agree on the amount of time Preston spent with W.C. each month. Preston "wanted to have him more per month." Zakariya testified that W.C. was "delayed" with speech and large motor skills. Zakariya felt that a consistent routine in preschool was beneficial to W.C., and she "wanted to promote stability for him rather than doing the confusing back and forth."

¶ 31    Zakariya testified that W.C. is connected to Des Moines, where he spends time with her significant other's family. Zakariya testified that there were "kids the same age" as W.C., and they attended church in Des Moines. Zakariya indicated that W.C. would begin to play sports in Des

Moines. Zakariya believed that a move to Des Moines would provide financial stability for W.C., because she would be eligible for a salary increase.

¶ 32    Finally, Preston testified. At the time of the hearing, Preston was 24 years old and worked "in an oil patch." He resided in Salem, Illinois, with his significant other and W.C. Preston worked Monday through Friday from seven in the morning until three in the afternoon. He was eligible for overtime. Other than briefly residing in Iowa with Zakariya, Preston lived in Illinois his whole life. He had a large family in Illinois. W.C. was close with Preston's family.

¶ 33    W.C. saw Dr. Stedelin in Centralia, Illinois, when he was with Preston. Dr. Stedelin was Preston's childhood physician. Preston introduced exhibits demonstrating that W.C. was seen by Dr. Stedelin for a physical and sick visits. Preston insured W.C. for the state of Illinois through his work.

¶ 34    Preston denied ever being violent towards Zakariya. Preston testified that the two would argue and "yell at each other," but he denied ever hitting her. When W.C. was with Preston, he was in the care of family members instead of daycare. Preston testified that he and Zakariya were unable to come to an agreement on a custody arrangement for W.C. as he was nearing school age.

¶ 35    Preston enrolled W.C. in T-ball. W.C. enjoyed T-ball. Preston enrolled W.C. in prekindergarten in Illinois. At the time of the hearing, W.C. attended prekindergarten for one week in Illinois, and W.C. seemed to enjoy it. Preston agreed that W.C. had a "speech impediment" but he had not taken steps for W.C. to be seen professionally for it.

¶ 36    Preston testified that W.C. was close to his cousins. Preston disagreed that Zakariya had W.C. the majority of the time. He also disagreed with Zakariya's statement that in March 2023, following the demise of the relationship, that Preston returned to Illinois and W.C. and Zakariya remained in Iowa.

¶ 37    On cross-examination, Preston testified that in December he had W.C. for 13 of 31 days. In January, he had W.C. for 9 of 31 days. In February, he had W.C. for 5 of 28 days. In March, he had W.C. for 12 of 31 days.

¶ 38    Following the conclusion of evidence on September 8, 2025, the trial court instructed the parties to submit written closing arguments. Following review of the written arguments, on November 20, 2025, the trial court entered an order denying Zakariya's motion to dismiss.

¶ 39    The trial court found that the parties were never married but shared one child. W.C. was born in Illinois, where both parties resided until October 2021. In October 2021, the family moved to Iowa. From October 2021 until March 2023, the parties and the minor child lived together in Iowa.

¶ 40    The trial court determined that in March 2023, the parties ended their relationship. Preston and W.C. moved back to Illinois, and for approximately one month, W.C. resided solely with Preston while Zakariya "got her life situated in Iowa." In May 2023, the parties agreed that W.C. would reside with both parties and alternate time between them on a two week on, two week off, basis.

¶ 41    According to the trial court, "This agreement worked until late 2024. At this point, [Zakariya] decided she wanted the minor child to primarily reside with her." The trial court determined that Preston "did not agree to this." The parties "attempted to come to an agreement regarding parenting responsibility and parenting time with the minor child, but were unable to reach one." Preston ultimately retained counsel in Illinois.

¶ 42    On April 9, 2025, Preston filed a petition to establish parentage in Illinois. The trial court found that at that time, "no pleading had ever been filed in any state regarding the minor child, including the state of Iowa." The trial court noted that the six-month period it must consider in

determining W.C.'s home state was October 9, 2024, until April 9, 2025. The evidence demonstrated that W.C. resided with Preston for 50 days and Zakariya for 132 days during this period.

¶ 43 The trial court concluded that W.C. "had health insurance in both Illinois and Iowa, had a primary care physician in both Illinois and Iowa, and had a home set up for him with each respective parent for him to live full time." The trial court noted, however, that Zakariya's "testimony during her case-in-chief versus her testimony as an adverse witness for [Preston] was inconsistent, causing her credibility to be questionable at best as to whether she believed there was any agreement between her and [Preston] regarding the home state of the minor child."

¶ 44 The trial court found that W.C. played in a T-ball league in Illinois. The trial court observed that while in Iowa, W.C. had minimal participation in any activities. The trial court noted that "other than" Zakariya and her "paramour," W.C.'s family all lived in southern Illinois. The trial court concluded that the majority of the evidence in this case "rests in Illinois."

¶ 45 The trial court determined that in order to decide which state had subject matter jurisdiction, it looked to the three-step process outlined in the Act. First, the trial court considered whether Illinois was the home state of W.C. The trial court noted that if Illinois was the home state, Illinois courts could exercise jurisdiction. If not, the trial court explained that the second step was to determine whether Iowa is W.C.'s home state.

¶ 46 The trial court explained that if it was determined that neither Illinois nor Iowa were the home state, or if W.C. had no home state, then Illinois could exercise jurisdiction if (1) W.C. and at least one parent had significant connections to Illinois, and (2) substantial evidence was available in Illinois concerning W.C.'s care, protection, training and personal relationships. The

11

trial court noted that the "home state" was the state in which a child lived with a parent for at least six consecutive months immediately prior to the proceedings being filed.

¶ 47    Based on the evidence presented, the trial court determined that neither Illinois nor Iowa were the home state of W.C. since he "has not resided with either parent in either state for a period of six months prior to the filing of the petition." The trial court determined that it was not the intent nor agreement of the parties to agree to a home state of W.C. when he was spending periods of time in both Illinois with Preston and Iowa with Zakariya, but instead the parties were trying to look out for the best interest of W.C. in maximizing time with each parent until such point the parties reached agreement on a permanent solution.

¶ 48    The trial court therefore applied the "significant connection test" and determined that both Preston and W.C. had "significant connections in the State of Illinois due to family, medical care and sports connections within the state." The trial court concluded that "significant evidence exists in Illinois, namely the witnesses, medical records from Dr. Stedelin, family connections, and personal relationships with non-family." Therefore, the trial court chose "to exercise jurisdiction in this matter" and denied Zakariya's motion to dismiss.

¶ 49    This court granted Zakariya's petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Oct. 1, 2020). This timely appeal followed.

¶ 50                                  II. ANALYSIS

¶ 51    On appeal, Zakariya raises numerous issues. First, she argues that the trial court erred by failing to identify Iowa as W.C.'s home state. Second, she argues that the trial court erred by considering factors that occurred outside of the six months immediately preceding the filing of the petition to establish parentage. Third, she argues that the trial court erred by finding that Illinois, not Iowa, had significant connections as set forth in section 201(a)(2) of the Act. Finally, she

12

argues that the trial court erred by failing to conduct a conference pursuant to the Act with the judge presiding in Iowa upon learning of the pending action. For the reasons that follow, we affirm.

¶ 52                                    A. Jurisdiction

¶ 53    As an initial matter, we note that Preston argues that this court should dismiss Zakariya's appeal, where this court lacks jurisdiction to proceed. Following the denial of Zakariya's motion to dismiss, she filed a petition for leave to appeal to seek interlocutory review of the issues now on appeal. This court allowed the petition pursuant to Illinois Supreme Court Rule 306(a)(2) (eff. Oct. 1, 2020), which permits appeals from an order of the trial court denying a motion to dismiss on the grounds of *forum non conveniens*. Preston contends that Zakariya's brief "at no point" raises the issue of *forum non conveniens*. As such, he requests that "her appeal should be denied as there is no jurisdiction to proceed." We disagree, and first consider whether this court has jurisdiction to consider the merits of the claims herein.

¶ 54    We have an independent duty to review our jurisdiction. *People v. Smith*, 228 Ill. 2d 95, 104 (2008). The filing of a notice of appeal " 'is the jurisdictional step which initiates appellate review.' " *Id.* (quoting *Niccum v. Botti, Marinaccio*, *DeSalvo & Tameling, Ltd.*, 182 Ill. 2d 6, 7 (1998)). Unless there is a properly filed notice of appeal, a reviewing court has no jurisdiction over the appeal and is obliged to dismiss it. *Id.* While the notice of appeal is jurisdictional, it is generally accepted that such notice is to be construed liberally. *Id.* The purpose of a notice of appeal is to inform the prevailing party in the trial court that the other party seeks review of the judgment. *Id.* Thus, the notice should be considered as a whole and will be deemed sufficient to confer jurisdiction on an appellate court when it fairly and adequately sets out the judgment complained of and the relief sought, thereby advising the successful litigant of the nature of the appeal. *Id.* at 105.

¶ 55    "The doctrine of *forum non conveniens* is an equitable doctrine that assumes the existence of more than one forum with jurisdiction over the parties and the subject matter of a case. [Citation.] Application of the doctrine invokes principles of convenience and fairness in choosing between two or more forums that have jurisdiction." (Internal quotation marks omitted.) *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 105 (1990). The doctrine "gives courts discretionary power that should be exercised only in exceptional circumstances when the interests of justice require a trial in a more convenient forum." (Emphasis omitted.) *Langenhorst v. Norfolk Southern Ry. Co.*, 219 Ill. 2d 430, 442 (2006).

¶ 56    The Act has specific provisions pertaining to the inconvenient forum doctrine. The Act "was promulgated to end custody jurisdictional disputes between states, to promote cooperation between states in determining custody issues, and to enhance the ability of states to enforce custody orders expeditiously." (Internal quotation marks omitted.) *Fleckles v. Diamond*, 2015 IL App (2d) 141229, ¶ 32. The Act "provides state trial courts with a method to resolve jurisdictional questions that arise in interstate child custody disputes, and the statute gives priority to the state that is the child's 'home state.' " *Id.* The "home state" means "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." 750 ILCS 36/102(7) (West 2024).

¶ 57    Section 207(b) of the Act additionally instructs:

"Before determining whether it is an inconvenient forum, a court of this State shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

14

(1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(2) the length of time the child has resided outside this State;

(3) the distance between the court in this State and the court in the state that would assume jurisdiction;

(4) the relative financial circumstances of the parties;

(5) any agreement of the parties as to which state should assume jurisdiction;

(6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) the familiarity of the court of each state with the facts and issues in the pending litigation." *Id.* § 207(b).

¶ 58 In the case before us, Zakariya filed a three count motion to dismiss for lack of jurisdiction under the Act "pursuant to [the Act] Sections 201, 203 & 207." In the motion, Zakariya argued extensively about the factors set forth in section 207(b) of the Act.

¶ 59 First, Zakariya pointed to section 207(b)(1), alleging that the relationship between the parties ended as a result of Preston's sexual manipulation and emotional abuse. At the hearing on the motion to dismiss, the trial court heard testimony related to alleged domestic violence and sexual manipulation from Zakariya. Preston denied engaging in domestic violence. The court made no specific findings related to the alleged domestic violence.

¶ 60 Turning to section 207(b)(2), Zakariya argued that W.C. "never resided within the State of Illinois for any significant length of time." At the hearing on the motion to dismiss, the trial court

15

heard extensive testimony from the parties about their custody arrangements and where W.C. resided day-by-day over the course of the six months prior to the filing of Preston's parentage petition. The trial court ultimately made specific findings about the length of time that W.C. spent in Illinois, finding that W.C. resided in Illinois with Preston for 50 days of the six-month period. The trial court also noted that W.C. never spent a full month in either state.

¶ 61 Pointing to section 207(b)(3), Zakariya argued that the distance between Marion County and a court of jurisdiction in Iowa was significant. Similarly, turning to section 207(b)(4), Zakariya argued that it would be a financial hardship for her to maintain the parentage action in Illinois. During the hearing on the motion to dismiss, the trial court heard evidence about the commute time between states and homes. Zakariya testified that it was approximately a five-hour drive from her home in Iowa to Preston's home in Illinois. Both parties testified about their jobs, incomes, and the cost of childcare. The trial court considered this evidence in its written order.

¶ 62 Looking at section 207(b)(5), Zakariya noted that the parties originally moved to Iowa with W.C., and Preston returned to Illinois alone. Zakariya's testimony was inconsistent on this point during the motion to dismiss hearing. The trial court ultimately determined that her credibility was at issue, where the evidence established that upon the parties break up, W.C. returned to Illinois with Preston while Zakariya made childcare arrangements in Iowa.

¶ 63 Turning to section 207(b)(6), Zakariya alleged that W.C. and "any potential witnesses are all located and/or reside in the State of Iowa or outside the State of Illinois, and Iowa would be the more appropriate forum for this action." The trial court heard extensive evidence from numerous witnesses. Ultimately, the trial court determined that Illinois was the appropriate jurisdiction, where W.C. had significant connections to Illinois.

¶ 64    In the case before us, there was a dispute between the parties regarding the home state for purposes of the Act. As such, the trial court was required to consider the factors set forth in section 207(b) to determine whether Illinois was an inconvenient forum and did so consider the factors. Zakariya sufficiently pleaded and argued the factors pursuant to section 207(b). The trial court considered evidence and made rulings related to the merits of those factors. The trial court also references sections 201, 203, and 207 of the Act in its November 20, 2025, order. Therefore, we find that this court may exercise jurisdiction over the merits of this appeal.

¶ 65                                    B. Standard of Review

¶ 66    Our consideration of the issues herein is governed by the Act (750 ILCS 36/101 *et seq.* (West 2024)). While the Act uses the term "jurisdiction" to describe conditions that must be met before an Illinois court can decide a question of initial child custody, "jurisdiction" here does not mean "a precondition to the exercise of the court's inherent authority." *McCormick v. Robertson*, 2015 IL 118230, ¶ 27. Rather, "jurisdiction" under the Act is "simply a procedural limit on when the court may hear initial custody matters." *Id.* In finding that it has jurisdiction, the trial court interpreted provisions of the Act. Therefore, we review the trial court's determination *de novo*. *In re D.S.*, 217 Ill. 2d 306, 313 (2005).

¶ 67    However, a decision regarding *forum non conveniens* is reviewed for an abuse of discretion. *Ruch v. Padgett*, 2015 IL App (1st) 142972, ¶ 36. That is, we will reverse the circuit court's decision only upon a showing that the circuit court abused its discretion in balancing the relevant factors. *Id.* ¶ 38. A circuit court abuses its discretion in balancing the relevant factors only where no reasonable person would take the view adopted by the circuit court. *Langenhorst*, 219 Ill. 2d at 442. However, "we may affirm a trial court's *forum non conveniens* order on any basis

17

found in the record." *Ruch*, 2015 IL App (1st) 142972, ¶ 40. Under either standard of review, we are compelled to affirm.

¶ 68                                  C. Home State and Significant Connections

¶ 69    Zakariya first argues that the trial court erred by finding Illinois was W.C.'s home state. Preston responds, arguing that the trial court properly found that Iowa was not W.C.'s home state, where W.C. did not live in either Iowa or Illinois for a period of time long enough to establish either state as the home state. For the reasons that follow, we find that the trial court properly determined that W.C. had no home state, where he did not consecutively reside in either state for six months preceding the filing of Preston's petition for parentage.

¶ 70    Before we address the issue of W.C.'s home state, we will briefly address an issue raised in the dissent that was not raised by Zakariya in either the trial court or on appeal—that "the court was first required to determine if Preston was a "person acting as a parent." First, we note that in her "petition to establish paternity, custody, visitation, and support" filed in Wapello County, Iowa, Zakariya admitted that Preston was the father. Specifically, Zakariya stated, "The Petitioner and the Respondent are natural parents of the following minor child: W.C."

¶ 71    Nonetheless, the appellate court should not, and will not, consider different theories or new questions, if proof might have been offered to refute or overcome them had they been presented in the trial court. *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967) ("In exercising the power care should be taken that the litigants are not deprived of an opportunity to present argument."). Preston was given no opportunity to respond to this issue in either the trial court or on appeal. Nor has this issue even been briefed by the parties. The dissent cites no authority in support of the legal proposition that the trial court was first required to determine if Preston was a "person acting as a parent" before addressing the issue of the child's home state. As this issue has not been raised in either the trial

18

court or on appeal and has not been briefed or argued by the parties, we properly decline to address it. *Id.* Moreover, it is absurd for the dissent to suggest that the court erred by failing to find that Preston was a "person acting as a parent" and not require the same of the mother.

¶ 72    Section 201(a) of the Act outlines the circumstances in which "a court of this State has jurisdiction to make an initial child-custody determination." 750 ILCS 36/201(a) (West 2024). Illinois has jurisdiction if:

> "(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

> (2) a court of another state does not have jurisdiction under paragraph (1) *** and:

>> (A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

>> (B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

> (3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under Section 207 or 208; or

> (4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)." *Id.*

¶ 73    The Act defines "home state" as

"the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned." *Id.* § 102(7).

¶ 74    In the case before us, the evidence supported the trial court's conclusion that W.C. had no home state. The trial court specifically looked at the process outlined in the Act. First, the trial court considered whether Illinois was the home state of the child. Based on the evidence presented, the trial court determined that neither Illinois nor Iowa were the home state of the minor child since the minor child "has not resided with either parent in either state for a period of six months prior to the filing of the petition." This determination was supported by the record, where the parties both testified that W.C. split time between households in Iowa and Illinois. The evidence established that W.C. resided with Preston for 50 days and Zakariya for 132 days during the six-month period of October 10, 2024, to April 9, 2025. The trial court specifically noted that W.C. never spent the entirety of a month in either Iowa or Illinois. As such, based on our review of the evidence and testimony, the trial court properly determined that neither Illinois nor Iowa was W.C.'s home state.

¶ 75    In addressing the issue of the child's home state, the dissent acknowledges that "the parties had an established parenting time schedule with 50/50 custody after Preston returned to Illinois." *Infra* ¶ 105. The dissent notes that after September 16, 2024, when the child was enrolled in an Iowa preschool, the child primarily lived with Zakariya and spent time with Preston when not in preschool. The dissent states that in "my opinion, it is obvious that Preston's time with the minor child stemmed from the tentative parenting agreement with Zakariya which provided her with primary residential custody in Iowa." *Infra* ¶ 105. First, the dissent overlooks the fact that there

was no custody determination made by any court as to W.C. Second, the evidence established that W.C. did not regularly attend preschool in Iowa, where Ellis testified that he attended less than half-time in Iowa. Third, by expressing this opinion, the dissent is substituting its judgment for that of the trial court where it did not find Zakariya's testimony credible as to the amount of time W.C. spent with Zakariya in Illinois. "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). In rejecting Zakariya's testimony that the parties had a parenting time agreement, the trial court found that the parties "attempted to come to an agreement regarding parenting responsibility and parenting time with the minor child, but were unable to reach one." We find no error in the trial court's finding in that regard. Nor do we find error in the trial court's determination that the child did not have a home state.

¶ 76    Zakariya also contends that the trial court erred by finding that W.C. had significant connections to Illinois. Preston responds, arguing that the trial court properly found that Illinois had significant connections after applying the significant connections test, where the evidence demonstrated that W.C. had significant connections to Illinois. We agree with Preston.

¶ 77    Because neither Illinois nor Iowa was W.C.'s home state, the trial court applied the "significant connection test" and determined that W.C. had "significant connections in the State of Illinois due to family, medical care and sports connections within the state." The evidence demonstrated that Dr. Stedelin saw W.C. for a physical and sick visits in Illinois. Preston had family ties to the southern Illinois area, and W.C. spent time with his grandfather and cousins. Harold C., W.C.'s grandfather, testified that he had a great relationship with W.C. and hosted Sunday cookouts with his family. Harold testified that he had a large extended family with children W.C.'s age. Both Harold and Preston testified that W.C. played T-ball in Illinois, which he

21

enjoyed. W.C. was enrolled in preschool in Illinois. Based on this evidence, the trial court concluded that "significant evidence exists in Illinois, namely the witnesses, medical records from Dr. Stedelin, family connections, and personal relationships with non-family."

¶ 78    On the other hand, Zakariya testified that she did not have family connections in Iowa. She testified that W.C. saw a physician, Dr. Dodson, in Iowa. However, Dr. Dodson testified that he never actually examined W.C. Moreover, both Zakariya and Quick testified that Zakariya intended to move to Des Moines with W.C., which would further uproot him from any slight connections and community he made in Ottumwa, Iowa.

¶ 79    For these reasons, based on the record before us, the trial court did not err by finding that Illinois had jurisdiction over this matter, where W.C. had significant connections to Illinois. We will briefly comment on the dissent's analysis of this issue. We note that the dissent in its analysis of the trial court's application of the significant connections test blends discussion of W.C.'s home state analysis. After discussion of the trial court's finding that W.C. had significant connections with Illinois, the dissent circles back and again concludes that W.C.'s home state was Iowa. We clearly view these as separate issues which the dissent has incorrectly blended into one.

¶ 80                              D. Residency Period

¶ 81    Next, Zakariya argues that the trial court erred where it made factual findings outside of the six-month residency period. Preston responds, arguing that the trial court did not err by considering factors which occurred outside of the six months immediately preceding the filing of the petition to establish parentage. Specifically, Preston contends that Zakariya failed to allege what specific findings the trial court improperly made. Moreover, Preston argues that Zakariya fails to support her argument with case law or statutory support which prohibits the trial court from considering factors outside of the six-month residency requirement. For the reasons that follow,

22

we find that the trial court considered relevant evidence to determine whether W.C. had significant connections to Illinois.

¶ 82    The Act defines "home state" as

"the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned." 750 ILCS 36/102(7) (West 2024).

¶ 83    In the case before us, the six-month residency period ran from October 10, 2024, to April 9, 2025, when father filed his petition. The trial court determined that W.C. spent 132 days with Zakariya and 50 days with Preston. The evidence established that W.C. never spent an entire month with either party and up until the time of the dispute, the parties shared nearly equal parenting time.

¶ 84    Zakariya fails to specify what specific facts, if any, the trial court improperly relied upon. She seems to suggest that the trial court's findings related to the place of W.C.'s birth, Zakariya's prenatal care, pediatrician appointments, and W.C.'s T-ball participation, all fell outside of the six months prior to Preston's filing of the petition for parentage. However, these facts were relevant to the application of the significant connections test, as set forth above. The trial court applied the test and cited W.C.'s various connections with Illinois, including the presence of a network of extended family in Illinois. As noted above, the evidence demonstrated that W.C. spent a considerable amount of time with Preston in Illinois, was enrolled in preschool in Illinois, had a pediatrician in Illinois, regularly spent time with extended family in Illinois, and played T-ball in Illinois. Zakariya also had family in Illinois, and she had no family in Iowa. Therefore, the trial

23

court did not err by considering evidence relevant to determine whether W.C. had significant connections to Illinois, even where some evidence allegedly fell outside the parameters of October 10, 2024, to April 9, 2025.

¶ 85                                E. Conference Pursuant to the Act

¶ 86    Finally, Zakariya argues that the trial court erred where it failed to conduct a conference pursuant to the Act with the presiding judge in the pending action in Iowa, relying on section 204(d). *Id.* § 204(d). Preston responds, arguing that the trial court did not err by failing to conduct a conference pursuant to the Act with the judge in Iowa, where neither party sought relief under section 204(d). As such, Preston argues that the requirement for communication with the Iowa judge was not applicable to this cause. Although we recognize that Zakariya raises this issue under section 204(d), we find that section 206 is the appropriate statutory section to consider this issue under.

¶ 87    Pursuant to section 206:

"Except as otherwise provided in Section 204, a court of this State, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to Section 209. If the court determines that a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this Act, the court of this State shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this Act does not determine that the court of this State is a more appropriate forum, the court of this State shall dismiss the proceeding." *Id.* § 206(b).

¶ 88    At the August 18, 2025, hearing, Zakariya notified the trial court of a pending action filed on August 1, 2025, in Iowa. She referenced a child support action that was pending since April

24

2025 in Iowa. Preston filed his petition to establish parentage in Illinois on April 9, 2025, along with a temporary custody and child support petition in Illinois on April 10, 2025.

¶ 89    We find *In re Sophia G.L.*, 229 Ill. 2d 143, 172 (2008), instructive. In *Sophia G.L.*, our supreme court concluded that the court with the initial custody jurisdiction, *i.e.* the court where the first action was filed, does not have an obligation to initiate communications with a second court. *Id.* However, if the second court initiates communication with the first court, the first court is required to participate in the communication. *Id.*

¶ 90    In the case before us, the record is vague on whether the trial court was aware of the April 2025 child support petition filed in Iowa. On the first day of the hearing, Zakariya testified that there was an action pending in Wapello County, Iowa, where she resided. She also testified that she filed for child support in Iowa. However, she did not provide any specific information to the trial court about these pending actions. Zakariya ultimately filed her own action in Iowa on August 1, 2025, well after Preston's petition for parentage was filed on April 9, 2025. Zakariya's August 1, 2025, petition set forth the specifics of the Illinois case, including the Illinois case number.

¶ 91    Based on our interpretation of *Sophia G.L.*, it was the duty of the Iowa judge to communicate with the Illinois trial court. Simply stated, the trial court in Illinois lacked specific information to initiate a conference, where it was the court of first action. Based on the specific facts before us, we cannot say that the trial court erred when it did not conduct a conference pursuant to the Act with the judge in Iowa.

¶ 92                                    III. CONCLUSION

¶ 93    For the foregoing reasons, we affirm the November 20, 2025, order of the circuit court of Marion County denying Zakariya's motion to dismiss.

¶ 94    Affirmed.

25

¶ 95    JUSTICE VAUGHAN, dissenting:

¶ 96    I respectfully disagree with my colleagues' decision. I believe the circuit court's findings related to the minor child's lack of a home state were in error.

¶ 97    First, it is undisputed that the initial pleadings filed on April 9, 2025, and April 10, 2025, were filed by Preston. The initial pleading requested the court establish parentage and award Preston parental responsibility over W.C.'s medical, educational, religious, and extracurricular welfare. The second pleading was a two-count petition for temporary relief with the first count requesting allocation of temporary parental responsibility over W.C. At that time, Preston alleged that W.C. always resided at least 50% of the time with Preston and resided with Preston two-thirds of the time in 2023 and 2024. He further alleged that Zakariya refused to facilitate a close and loving relationship between Preston and W.C. The second count requested the court to direct Zakariya to pay Preston temporary child support, maintain W.C. on her health insurance and pay for all of W.C.'s health-related expenses which were not covered by health insurance.

¶ 98    On July 9, 2025, Zakariya filed a motion to dismiss for lack of jurisdiction pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act (Act) (750 ILCS 36/101 *et seq.* (West 2024)). Zakariya's motion contended that W.C. had primarily resided in Iowa over the last four years and was currently residing in Iowa. The motion further noted that "paternity of the minor child, including establishment of [Preston] as the child's father, has yet to be determined." The motion alleged that from April 2023 to September 2024, the parties shared custody of W.C. with each party having equal parenting time throughout the year. Zakariya's motion further alleged that Preston received three to four days per month of parenting time from October 2024 to April 2025. At the time of the hearing, parentage and jurisdiction under the Act remained pending.

¶ 99     This appeal stems from the circuit court's denial of Zakariya's motion and concerns whether Illinois courts have subject matter jurisdiction to determine custody of W.C. Pursuant to the Act, Illinois courts have

"jurisdiction to make an initial child-custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under Section 207 or 208, and:

(A) the child and the child's parents *** have a significant connection with this State other than mere physical presence; and

(B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships[.]" *Id.* § 201.

¶ 100     The circuit court determined that the minor child had no home state. However, it is my opinion that the court's finding is erroneous. First, the court never determined if Preston was either a parent or a "person acting as a parent." Despite having venue (see 750 ILCS 46/604(a) (West 2024)) and jurisdiction (*id.* § 603) to address the parentage issue, no finding was made by the court. As such, the court was first required to determine if Preston was a "person acting as a parent." However, no such determination was made by the circuit court.

¶ 101     The phrase "person acting as a parent" is defined by the Act as

"a person, other than a parent, who:

27

(A) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child-custody proceeding; and

(B) has been awarded legal custody by a court or claims a right to legal custody under the law of this State." 750 ILCS 36/102(13) (West 2024).

¶ 102 There was no evidence that Preston had physical custody of W.C. Indeed, the circuit court found the opposite and determined that W.C. spent 132 days with Zakariya and 50 days with Preston in the six months prior to the filing based on the exhibit filed by Zakariya. The only evidence regarding the six months prior to October 2024, to complete the full year required by section 102(13)(A) of the Act, indicated that the parties each kept the child for two weeks during that period so at most, 91 days can be attributed to Preston. Combining the two periods, 141 days would be attributed to Preston, and 223 days would be attributed to Zakariya.

¶ 103 Indubitably, 141 days does not amount to six months and therefore, only if the temporary absences can be included in Preston's time would Preston reach the required six consecutive month threshold required by the Act. See *Id.* § 102(13)(A). However, the court also failed to address the temporary absence phrase included in the statute defining "person acting as a parent."

¶ 104 Temporary absence is not defined by the Act; however, it has been defined by case law addressing the Act. " '[T]emporary' means ' "[t]hat which is to last for a limited time only, as distinguished from that which is perpetual, or indefinite, in its duration." ' " *Richardson v. Richardson*, 255 Ill. App. 3d 1099, 1102 (1993) (quoting *Allstate Insurance Co. v. Stewart*, 158 Ill. App. 3d 129, 133 (1987), quoting Black's Law Dictionary 1312 (5th ed. 1979)). " '[A]bsence' means '[t]he state of being absent, removed, or away from one's domicile, or usual place of residence.' " *Id.* (quoting Black's Law Dictionary 8 (5th ed. 1979)). The temporary absence

28

provision of the home state test is "designed merely to prevent lapses in the six-month period caused by brief inter-state visits by the child." *In re Marriage of Arulpragasam*, 304 Ill. App. 3d 139, 148 (1999).

¶ 105   The facts revealed that the parties had an established parenting time schedule with 50/50 custody after Preston returned to Illinois. At that time, W.C. was three years old and was not in school. However, after September 16, 2024, W.C. attended preschool in Iowa and primarily lived with Zakariya, as evidenced by the greater number of days spent with Zakariya, who allowed substantial parenting time for Preston, when W.C. was not in preschool. While Preston disagreed that there was an actual agreement, he confirmed that it was the parenting time plan that he followed until he filed the current action. It was undisputed that Zakariya had the minor child for 223 days during the requisite six-month period and Preston had the child for 141 days in the year prior to the filing. In my opinion, it is obvious that Preston's time with the minor child stemmed from the tentative parenting agreement with Zakariya which provided her with primary residential custody in Iowa.

¶ 106   My conclusion is bolstered by the text messages that reveal Preston requesting time with W.C. from Zakariya, which is consistent with Zakariya's having primary residency status. The testimony from Preston's girlfriend revealed a similar tone by stating that Zakariya would "let us keep him," noting that Zakariya dictated the schedule of one week per month. Therefore, it is my opinion that Preston fails to meet the "person acting as a parent" requirements of the statute and since parentage was never determined by the circuit court, only Zakariya and the State of Iowa, where a similar petition is pending, have a valid claim for jurisdiction under the Act, and therefore, Illinois was never a valid possibility for finding a home state as a matter of law.

29

¶ 107   Second, even if I ignore the lack of any evidentiary finding, or evidence supporting the conclusion that Preston was either a parent or a person acting as a parent, the circuit court's finding of a significant connection with Illinois other than mere physical presence is simply unsustainable under any standard of review.

¶ 108   The parties moved to Iowa when W.C. was 10 months old. Preston moved back to Illinois in March of 2023. After approximately three weeks, during which Preston had W.C. in Illinois, the parties began a parenting time arrangement in which each would have W.C. for two-week-long periods. The arrangement continued until September 2024, when W.C. was enrolled in preschool to address his speech and motor developmental delays. According to Zakariya, the preschool environment assisted W.C. in overcoming his delays and the child was thriving in the environment. Thereafter, W.C. remained in Iowa with Zakariya to attend school and had parenting time with Preston when he was not in school because W.C. was required to attend the school regularly or he would lose his spot at the school. During that time, Preston assisted with the tuition payment by paying $400 monthly to Zakariya. Zakariya requested an increase in the payments. Preston then unilaterally stopped making the payments, filed his parentage petition and testified that preschool was free in Illinois.

¶ 109   While I note that the circuit court found that Zakariya was not credible as to whether she believed there was an agreement, during both her case-in-chief and adverse witness testimonies, Zakariya's statements were supported by the text messages sent to Preston. Conversely, the majority of Preston's allegations regarding W.C. and Zakariya were controverted by the evidence. Preston was not the primary caretaker and did not provide daily care to W.C. Further, W.C. was not "totally dependent upon [Preston] to provide his necessary care." Zakariya did not move to Iowa; the parties moved to Iowa and Preston later returned to Illinois. Preston claimed it was in

W.C.'s best interest to "commence school" in the fall of 2025, but W.C. was already enrolled in school in Iowa for the 2024 school year. Preston never had W.C. a majority of the time during any relevant time periods and Zakariya's allowance of liberal visitation when W.C. was not in school controverted Preston's claim that Zakariya "refuses to facilitate a close and loving relationship" between W.C. and Preston. In fact, Preston admitted at the hearing that Zakariya never denied him time with W.C.

¶ 110  Despite Preston testifying that he never agreed to the shorter visitation period, Preston confirmed the parties "sort of" had an agreement for holidays and agreed that under the 2024 parenting time plan he was able to enroll W.C. in T-ball. He disagreed that the parties attempted to share the time with W.C. equally but agreed the parties had W.C. for equal two-week-long period for over a year. He further disagreed that Zakariya had W.C. the majority of the time but provided no evidence controverting the calendars submitted by Zakariya that set forth the parenting time for the six-month period prior to Preston filing the action which revealed Zakariya had W.C. the majority of the time.

¶ 111  While Preston claimed that W.C. had established medical care in Illinois, the records submitted revealed that the visit to "establish medical care" occurred on April 30, 2025, which was after Preston filed the current action. Notably, Preston did not even have a copy of W.C.'s vaccination records at the visit and medical staff requested Preston provide them with copies of the records. The only other medical records were for W.C.'s discharge following his birth in December 2020, and for an allergic reaction visit on November 2, 2023, that stated the child's mother took him to the appointment. On the same day that Preston established medical care for W.C. in Illinois, he also enrolled W.C. in prekindergarten and admitted that he did not tell Zakariya about either action. Zakariya only found out about the enrollment in school and medical treatment

31

when the exhibits for the hearing were exchanged, which is far from indicative of his "ultimate goal to facilitate a relationship between the minor child and both parties." Finally, Preston initially testified that W.C. was on his work insurance for over a year but later admitted it was only for six months, obtained one month before he filed the pleadings, when questioned about the effective date on the insurance card.

¶ 112 Zakariya's testimony also revealed that W.C. received health insurance through the Medicaid Iowa Total Care program since September 2021. She stated that the minor child had to be a resident of Iowa for the program to apply. After Preston enrolled the minor child for Medicaid in Illinois in 2023, Zakariya had to "provide substantial proof" that the minor child "was a resident of Iowa in order to avoid his Medicaid termination." She was ultimately successful in meeting that burden.

¶ 113 Based on the evidence submitted, the circuit court found that W.C. had "very minimal participation in any activities" in Ottumwa, Iowa, and instead participated in activities in Des Moines, Iowa. However, both cities are in Iowa. Further, Zakariya testified that she and the minor child attended church and visited arcades and amusement parks in their free time. They were also involved with the community and volunteered at the women and children's center in Ottumwa, Iowa. Zakariya also volunteered to assist with baking events at the minor child's school. She stated that W.C. had friends at school and was friends with her coworkers and their children as well as her paramour and his children.

¶ 114 " 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. *** A period of temporary absence of any of the mentioned persons is part of the period." 750 ILCS 36/102(7) (West 2024). The temporary absence provision of the home state

32

test is "designed merely to prevent lapses in the six-month period caused by brief interstate visits by the child." *In re Marriage of Arulpragasam*, 304 Ill. App. 3d at 148.

¶ 115 Based on these facts, it is my opinion that the minor child's home state was Iowa and that Preston's parenting time periods were temporary absences from Iowa. It is obvious that W.C. lived with Zakariya, went to preschool in Iowa, and that Zakariya provided parenting time with Preston based on the time when W.C. was not in school. The Act requires a look back of six months. 750 ILCS 36/102(7) (West 2024). The "home state" test is, thus, a simple one: "where has the child lived with a person acting as a parent for the last six months?" *In re Marriage of Arulpragasam*, 304 Ill. App. 3d at 148; *Richardson*, 255 Ill. App. 3d at 1102. The reason for the child's presence in the state is what matters the most, and a mutual agreement for a child to visit should not restart the calculation elsewhere. *In re Parentage of Frost*, 289 Ill. App. 3d 95, 101-02 (1997).

¶ 116 Here, the six months prior to the filing reveal that W.C. lived primarily with Zakariya who afforded Preston liberal visitation when W.C. was not in preschool. W.C.'s parenting time with Preston was merely a temporary absence from his permanent residence with Zakariya as obviated by his school residency as well as Zakariya's ability to maintain Iowa insurance for W.C. Classifying these temporary absences as "substantial evidence *** concerning the child's care, protection, training, and personal relationship[ ]" (see 750 ILCS 36/201(a)(2)(B) (West 2024)) was erroneous. The circuit court's interpretation of these facts undermines familial cooperation that would provide a nonresidential parent parenting time and penalizes residential parents who are seeking to allow as much time as possible for the noncustodial parent. See *Frost*, 289 Ill. App. 3d at 101-02 (mutual agreement for the child to visit should not restart the calculation). Accordingly, I would reverse the circuit court's order, remand the case for a determination of parentage with

directions to grant Zakariya's motion to dismiss, and transfer the allocation of custody and parenting time to Iowa where a petition to establish parenting time and support is pending.

¶ 117 For the foregoing reasons, I believe the circuit court's decision was erroneous, and therefore, I dissent.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Marion County, No. 25-FA-32; the Hon. Wesley A. Gozia, Judge, presiding. |
| **Attorneys for Appellant:** | Jeanna S. Raney, of Blake Links Raney, P.C., of Belleville, for appellant. |
| **Attorneys for Appellee:** | Jeron Merrell Balazi, of Mt. Vernon, for appellee. |